CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant, v.
PUBLIC SERVICE COMMISSION OF STATE OF MISSOURI.

Division Two, October 11, 1926.

1. **HIGHWAY: Separation of Grades: Police Power.** An order of the
Public Service Commission requiring a separation of grades and the con-
struction of an overhead crossing at a point where a highway intersects a
railroad is a constitutional exercise of the police power in the interest of
public safety, and is authorized by statute (Sec. 10459-2, R. S. 1919).

2. ———: **Overhead Crossing: Cost.** The Public Service Commission has
authority to impose upon a railroad company the entire cost of the con-
struction and maintenance of a viaduct necessary to carry a state highway
over its tracks, where the necessity for the overhead crossing is due solely
to the existence of the tracks.

3. ———: ——— **Unreasonable Burden: Danger to Travelers.** The
public road is a primary state highway, traverses a rich and populous por-
tion of the State, and is an essential link in a transcontinental highway.
The Public Service Commission ordered th   an overhead crossing be con-
structed at the point where the highway crosses a railroad, and apportioned
one-third of the cost, or thirteen thousand dollars, to the railroad, which is
a branch-line of an interstate railway. Two freight and four passenger
trains travel the railroad each day, and the country is level and trains
approaching the intersection can be seen for long distances. But for the
presence of the railroad there would be no necessity for an overhead cross-
ing. Held, that grade crossings of railroads are dangerous; that it is com-
mon knowledge that fatal accidents occur at such places, although the
view of trains running in either direction is unobstructed; that considered
solely from a monetary standard it is obvious that a single collision with
a vehicle at the grade crossing might entail a larger loss upon the railroad
company than the amount apportioned to it as its reasonable share of the
cost of constructing the viaduct, and that it cannot therefore be ruled that
the apportionment of one-third of the cost to it is an unreasonable burden
upon interstate commerce, although the company be in financial straits.

4. ———: ———: **Bankrupt Company: Interstate Commerce.** The State
has authority to insist that highway crossings shall not be dangerous to
the traveling public, whatever may be the cost to the railroad company
which is required to pay a part of the cost of constructing a viaduct carry-
ing the highway over its tracks; and if it can be reasonably said that
safety requires the abolition of a grade crossing, neither the company's
prospective bankruptcy nor its engagement in interstate commerce, can
take away this fundamental right of the State as sovereign of the soil, to
compel the company to pay a part or the whole of the cost of a viaduct
or overhead crossing.

5. ———: **Grade Crossings: Outlaws.** The statute (Sec. 10459, R. S.
1919; Laws 1921, 1st Ex. Sess., pp. 131, 145) declares the policy of the
State in the construction of public highways; it outlaws, not dangerous,
but all grade crossings of railroads; it forbids, in express terms, all cross-
ings at grade, without the permission of the Public Service Commission,
and authorizes the Commission to refuse its permission, or to grant it upon
such terms as it may prescribe.

6. ———: **Viaduct over Railroad: Permission of Interstate Commerce Commission.** The Government of the United States insists that grades be separated at all crossings of railroads by primary highways, and the construction of a viaduct over an interstate railroad as a necessary part of a primary state highway, to cost the railroad company thirteen thousand dollars, for the construction of which the State will receive Federal aid, where the company's previous annual income, after paying preferred-stock dividends and all operating expenses and capital charges, was $915,-000, does not come within the provisions of the Transportation Act of Congress of 1920, and the Public Service Commission of Missouri is not required to obtain the approval or consent of the Interstate Commerce Commission before it can order such viaduct to be constructed and impose one-third of the cost upon the railroad company.

7. ———: ———: **Approaches: Cost Assessed Against Railroad.** Approaches are a necessary part of a viaduct over a railroad, and it is proper to apportion the cost of constructing them to the railroad company.

8. ———: ———: **Federal Aid.** Notwithstanding the construction of the primary state highway is a Federal-aid project and the Federal Government pays one-half the cost of construction, the Public Service Commission has power to assess against the railroad company one-third or the whole of the cost of a viaduct necessary to carry the highway over its railroad. The State selects all the projects upon which Federal-aid money allotted to the State is to be expended, and the allotment becomes state money, to be expended for the purposes stated in the Act of Congress, and the fact that the Federal Government will reimburse the State for one-half the money it expends in constructing the viaduct is not a matter in which the railroad company is concerned.

Corpus Juris-Cyc. References: **Railroads**, 33 Cyc., p. 290, n. 52, 54, 56; p. 291, n. 58, 61, p. 292, n. 67, 69.

Appeal from Cole Circuit Court.—*Hon. Henry J. Westhues*, Judge.

Affirmed.

*Luther Burns, Dumm & Cook* and *John E. Dolman* for appellant.

(1) Where Federal aid is asked and received by the State towards paying the cost of a separation of grades of a Federal-aid highway over a railroad, the power or authority of the State Public Service Commission in apportioning a part of such expense to the railroad is limited to that part of the expense representing the State's proportionate part, after deducting Federal aid. Laws 1921, 1st Ex. Sess., p. 138, sec. 16; State ex rel. Terminal Assn. v. Public Service Comm., 272 S. W. 961. (2) It is the duty of the State Highway Commission to apply Federal aid received by it on any particular project to that project, and it is without authority to ask and receive aid upon a particular project and then apply it and use it elsewhere. Laws 1921, 1st Ex. Sess. p. 138, sec. 16; Federal Highway Act, U. S. Comp. Statutes 1916, Supp. 1923; Sections 7477¼ C. C., 7477¼ J., 7477¼ L.,

7477¼ Q., 7477¼ R., U. S. Comp. Statutes 1916, Supp. 1923. (3) The court erred in affirming decision of respondent assessing one-third the cost of the approaches to the viaduct in question outside of appellant's right-of-way and representing more than one-half the cost of the entire structure against appellant. Such order under the guise of a proper exercise of the police power constitutes a taking of appellant's property without due process of law, contrary to the Fourteenth Amendment of United States Constitution. (4) The power of the respondent in ordering a separation of grades is limited to an exercise of the police power in the interest of the public safety and where the undisputed evidence and findings of respondent according to that evidence shows a crossing at grade would not be unusually unsafe and dangerous, respondent has no power to assess any part of the cost of a separation of grades against appellant without violating the due process clause of the Fourteenth Amendment to U. S. Constitution. State ex rel. Terminal Assn. v. Public Service Comm., 272 S. W. 957; Erie Railroad Co. v. Public Utilities Comm., 254 U. S. 394, 65 L. Ed. 322; City of Kirksville v. Hines, 285 Mo. 283; State ex rel. v. Fairchild, 224 U. S. 510, 56 L. Ed. 863; Great Northern Ry. Co. v. Minnesota ex rel. Railway Com., 238 U. S. 340, 59 L. Ed. 1337. (5) Under the undisputed evidence it is shown to be necessary for appellant to secure the permission of the Interstate Commerce Commission to issue securities in order to obtain the funds necessary to make the capital expenditure ordered by respondent, and respondent has no power or jurisdiction to order such expenditure without the consent of said Commission, as provided by the Act of Congress dated February 28, 1920, and commonly known as the Transportation Act. Railroad Com. v. So. Pac. Co., 264 U. S. 331, 68 L. Ed. 713; Sub-division 11, Sec. 8592A, U. S. Comp. Stat. 1916, 1923 Supp; Sub-division 2, Sec. 8592A, U. S. Comp. Stat. 1916, 1923 Supp.

*D. D. McDonald* and *J. P. Painter* for Public Service Commission, *L. Newton Wylder, Lue C. Lozier* and *Edgar Shook* for State Highway Commission.

(1) The Public Service Commission is vested with the authority to require separation of grades at crossings of highways with railroads and in doing so exercises the police power of the State in the interest of public safety. Railroad v. Bristol, 151 U. S. 556; Erie Railroad v. Utility Comm., 254 U. S. 394; 3 Elliott on Railroads (2 Ed.) sec. 1102; Wabash Railroad v. Defiance, 167 U. S. 88; Railroad v. Nebraska, 170 U. S. 57; Sec. 10459, R. S. 1919; State ex rel. Wabash Ry. Co. v. Pub. Serv. Comm., 306 Mo. 149. (2) Rail-

road corporations may be required, at their own expense, not only to abolish existing grade crossings, but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks or to carry their tracks over such highways. Chicago, Milwaukee & St. Paul Ry. v Minnesota, 232 U. S. 430; Mo. Pac. Ry. Co. v. Omaha, 235 U. S. 121; State ex rel. Terminal Assn. v. Public Serv. Comm., 272 S. W. 957; Denver & R. G. Railroad Co. v. Denver, 250 U. S. 241; Mo. Pac. Ry. Co. v. Duluth, 208 U. S. 583; Am. Tcb. Co. v. St. Louis, 247 Mo. 374; State ex rel. v. Mo. Pac. Ry. Co., 262 Mo. 720; State ex rel. v. Pub. Serv. Comm., 271 Mo. 270. (3) Approaches to the viaduct are a necessary part of the overhead crossing. The term "crossing" occurring in the statute is used to indicate the structure intended as a means of crossing the railroad. It is not confined to the part of the structure which is upon the railroad. Moberly v. Ry. Co., 17 Mo. App. 518; Farley v. Ry. Co., 42 Iowa, 234; State ex rel. v. Pub. Serv. Comm., 271 Mo. 284; Libby v. Canadian Pac. Ry. Co., 82 Vt. 316; Birlew v. Railroad Co., 104 Mo. App. 561; Roxbury v. Railroad Co., 60 Vt. 121; 3 Elliott on Railroads (3 Ed.) sec. 1565. (4) The State in the exercise of its police power in requiring separation of crossings of railroads with highways does not violate the "contract" clause nor the "due process" clause of the Federal Constitution. State ex rel. Terminal Assn. v. Pub. Serv. Comm., 272 S. W. 957; Atlantic Coast Line v. Goldsboro, 232 U. S. 548; Railroad v. Bristol, 151 U. S. 556. (5) The police power of the State to regulate grade crossings in the interests of public safety is not committed to the Interstate Commerce Commission by the Transportation Act. Railroad Com. v. Southern Pacific Co., 264 U. S. 330. (6) Although paid out only upon particular projects, Federal-aid funds are contributions to the State for highway purposes, and are, in effect, state funds. Sec. 16, p. 138, Laws 1921, 1st Ex. Sess.; Federal Highway Act, 42 Stat. 212; Beman v. Olcott, 95 Ore. 249, 187 Pac. 843. (7) The police power of the State is unaffected by the "Transportation Act." C. N. & S. T. P. Railroad Co. v. Railroad Commission, 204 N. W. 606; Milhollan v. Great Northern Ry. Co., 204 N. W. 994; Railroad Com. v. So. Pac. Co., 264 U. S. 331, 68 L. Ed. 713.

HIGBEE, C.—The appellant owns and operates a railroad, a branch line of its system, from Altamont, in Davies County, to St. Joseph, a distance of about fifty miles. The primary state highway from Hannibal to St. Joseph, designated as Route No. 8, crosses this branch line at a point about fourteen miles east of St. Joseph. On an application by the State Highway Commission, the Public Service Commission, the respondent, made an order requiring the State Highway Commission to construct a viaduct over appellant's

railroad track at said point and requiring appellant to pay $13,000, approximately one-third of the estimated cost of the structure, to be paid in monthly installments as the work progressed, as its just share of the cost of construction. On the application of the appellant this order was reviewed on *certiorari* proceedings and affirmed by the Circuit Court of Cole County; hence this appeal.

After hearing the evidence, the Public Service Commission, on January 6, 1925, filed its report which, after summarizing the averments of the application, the answer and the evidence, reads in part as follows:

"2. The Centennial Road Law (Laws 1921, Extra Session, 131, 147) designated a highway in Buchanan County beginning at St. Joseph and extending thence east to Dekalb-Buchanan county line. This highway was later designated as Route 8 by applicant. Route 8 will be the second most heavily traveled highway in the State, carrying traffic from northern Missouri, Iowa and northern Illinois going west through St. Joseph. A few miles east of the proposed crossing a north-and-south highway, known as Route 31, joins Route 8. All traffic from Route 31 going west to St. Joseph will also pass over Route 8 at the point of proposed crossing.

"Route 8 will pass over a switch track and the branch main line track of defendant, from Altamont, Missouri, to Atchison, Kansas. Traffic on this line consists of four passenger trains and two freight trains every twenty-four hours, a tri-weekly local train, plus a possible extra train. The scheduled speed of these trains is approximately twenty miles per hour. . . .

"Defendant will receive Federal aid for the purpose of constructing the proposed viaduct and its approaches in the amount of fifty per cent of the cost of said structure and its approaches.

"The proposed structure consists of a reinforced concrete viaduct 112 feet in length, made up of a 40-foot inner span and two end spans each thirty-six feet in length. The roadway is twenty feet wide, and vertical clearance above the top of rail is twenty-two feet, and the approaches consist of earth embankments with six per cent grades.

"3. It appears from the evidence that the proposed crossing will not be unusually unsafe and dangerous. Apparently the visibility of approaching trains is good. Traffic on the railroad is light and the speed of train movements is slow, the scheduled speed of trains being approximately twenty miles per hour.

"On the other hand, Route 8 will be one of the most heavily traveled highways in Missouri and will be extensively used by tourists. All grade crossings are dangerous. The cost of a single accident may amount to thousands of dollars. The possibility of accident will be removed by the proposed viaduct, and defendant will there-

fore participate in the benefits derived from said proposed structure. Route 8 is a primary road. The Federal Government insists that grades be separated at all primary road crossings. Provisions have been made for the separation of grades at other crossings on Route 8. It therefore appears that grades should be separated at the crossing under consideration and that applicant should be required to use its influence with local authorities to close the existing grade crossing located about one-eighth of a mile from the proposed crossing.

"Defendant claims that the proposed structure being a Federal-aid project over a branch-line track where train movements are few and slow, the entire expense, after deducting amount of Federal aid, should be borne by applicant. As shown by brief of applicant, Federal-aid money is allotted to the State for highway purposes. Apparently, this allotment was not made for the purpose of relieving the railroads from their obligation to bear, at least, a part of the cost of grade separation. . . .

"In consideration of the few train movements and slow speed of same, it appears that a just and reasonable apportionment of the cost would be to assign $13.000 to defendant. This is approximately one-third of the estimated cost of the viaduct, including its approaches."

An order was made in accordance with this report.

I.   Section 10459, Revised Statutes 1919, reads, in part, as follows:

"1.   No public road, highway or street shall hereafter be constructed across the track of any railroad corporation at grade . . . without having first secured the permission of the commission.

**Police Power.** . . . The commission shall have the right to refuse its permission or to grant it upon such terms and conditions as it may prescribe.

"2.   The commission shall have the exclusive power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, apportionment of expenses, use and protection of each crossing . . . of a public road or highway by a railroad, . . . and to alter or abolish any such crossing, and to require, where, in its judgment, it would be practicable, a separation of grades at any such crossing heretofore or hereafter established, and to prescribe the terms upon which such separation shall be made and the proportions in which the expense of the alteration or abolition of such crossings or the separation of such grades shall be divided between the railroad or street railroad corporations affected, or between such corporations and the State, county, municipality or other public authority in interest."

1114 Supreme Court of Missouri, Vol. 315. [April Term,

Section 29 of the Act of August 4, 1921 (Laws 1921, 1st Ex. Sess., 131, 145), created and established a state-wide connected system of hard surfaced public roads extending into each county of the State, "which shall be located, acquired, constructed, reconstructed and improved and ever after maintained as public roads, and the necessary grading, hard surfacing, bridges and culverts therefor shall be constructed by the State of Missouri."

The evidence shows, without contradiction, that the public road crossing the appellant's railroad at the point indicated is a primary highway and second in importance only to Route No. 2, between St. Louis and Kansas City. It not only traverses a rich and populous portion of the State but it is an essential link in a transcontinental highway.

**Costs.**

The order of the Public Service Commission requiring a separation of the grades and the construction of an overhead crossing at the point where the highway intersects the appellant's railroad is a constitutional exercise of the police power of the State in the interest of public safety. [State ex rel. Wabash Ry. Co. v. Pub. Serv. Comm., 306 Mo. 149 (4), 267 S. W. 102; M. K. & T. Ry. Co. v. Oklahoma, 46 Sup. Ct. Rep. 517 (1).] It was held in those cases that the entire cost of the change may be imposed on the railroad company, "whenever the elimination of grade crossings reasonably may be required."

In State v. Public Service Commission, 308 Mo. 359, 374, 272 S. W. 957, 961, Judge RAGLAND said:

"We think there can be no question, therefore, but that the Commission can lawfully impose upon a railroad the entire cost of the construction and maintenance of a viaduct necessary to carry a street over and across its tracks, where the facts warrant such imposition."

In that case the contour of the country was such that the railroad neither caused nor contributed to such necessity.

"On the other hand" (the opinion continues) "even if the contour of the ground alone requires the construction of a viaduct in the projection of a highway, still if its cost is enhanced by the presence or operation of a railroad, the railroad, to the extent of such enhancement, may be required to bear the cost."

In the case under consideration it is the presence of the railroad track which makes necessary the construction of the viaduct. Take away the railroad and there would be no more need or occasion for a viaduct than for a Chinese pagoda. Hence, under the rulings just referred to, the necessity for the overhead crossing being caused solely by the railroad track, the Commission, with entire propriety, might have apportioned the entire cost of the construction and maintenance of the viaduct to the railroad company.

II.    It is further contended that as the crossing is on level ground where there is an unobstructed view of trains running in either direction, there is no danger of crossing accidents; that the railroad is not benefited by the crossing; that the corporation is in straitened financial circumstances, and the order imposing approximately one-third of the cost of the viaduct on the railroad company is an unreasonable burden on interstate commerce.

**Unreasonable Burden.**

Every one knows that grade crossings of railroads are dangerous and that fatal accidents do occur at such places.  People driving over such crossings and trainmen operating locomotive engines are not always attentive.  The construction of the viaduct at the crossing in question will eliminate all such risks and hazards.  Considered solely from a monetary standpoint it is obvious that a single collision with a vehicle at this grade crossing might entail the loss of a larger sum than the $13,000 apportioned to the appellant as its reasonable share of the cost of constructing the viaduct.  .It is idle to say the appellant will derive no benefit from the construction of the viaduct.

In Erie Railroad Co. v. Board of Public Utility Commrs., 254 U. S. 394, 41 Sup. Ct. Rep. 169, the railroad company was ordered to make subways at fourteen of its street crossings in the city of Paterson and one overhead crossing, requiring an expenditure of $2,000,000.  In the opinion of the court, delivered by Mr. Justice HOLMES, the order was sustained as a constitutional exercise of the police power of the State, the State having the right to insist that highway crossings shall not be made dangerous to the public, whatever may be the cost to the railroad companies; "and, if it reasonably can be said that safety requires the abolition of grade crossings, neither prospective bankruptcy of the company nor its engagements in interstate commerce can take away this fundamental right of the State as sovereign of the soil."  [Syl. 2.]   "If the burdens imposed on a railroad by the State are so great that the road cannot be run at a profit, it can stop, whatever misfortune the stopping may produce."  [Syl. 4.]  "As a railroad company might have been charged with the whole expense of abolishing dangerous grade crossings, it could not complain that only ten per cent was thrown upon a street railway company by the State Board of Public Utility Commissioners."  [Syl. 5.]   The court said, page 412:

"If we could see that the evidence plainly did not warrant a finding that the particular crossings were dangerous there might be room for the argument that the order was so unreasonable as to be void.   The number of accidents shown was small and if we went upon that alone we well might hesitate.   But the situation is one that is always dangerous.   The board must be supposed to have known the locality and to have had an advantage similar to that of

a judge who sees and hears the witnesses. The courts of the State have confirmed its judgment. The tribunals were not bound to await a collision that might cost the road a sum comparable to the cost of the change. If they were reasonably warranted in their conclusion their judgment must stand. We cannot say that they were not. At some crossings the danger was less than at others, but it was necessary or at least prudent to proceed on a general plan. Upon the whole matter, while it is difficult to avoid the apprehension that the state officials hardly gave due weight to the situation of the company as a whole in their anxiety for the well-being of the State, we are of the opinion that they did not exceed their constitutional powers. The order should be regarded as stating a condition that must be complied with if the company continues to use the New Jersey soil.''

Our statute, quoted supra, declares the policy of the State in the construction of public highways; it outlaws, not dangerous, but all grade crossings of railroads; it forbids, in express terms, all crossings at grade, ''without having first secured the permission of the commission. The commission shall have the right to refuse its permission or to grant it upon such terms as it may prescribe.'' In view of this declared policy of the State and of what has been said, it does not appear that the order was unreasonable. [State ex rel. Washington University v. Public Service Comm., 308 Mo. 347, 272 S. W. 974, and cases cited supra.]

III. It is further argued that the evidence shows it will be necessary for the appellant to secure the permission of the Interstate

**Permission of U. S. Commerce Commission.**

Commerce Commission to issue securities to obtain the funds to make the capital expenditure ordered by the respondent, and that the respondent has no power or jurisdiction to order such expenditure without the consent of the Commission, as provided by the Act of Congress, approved February 28, 1920, commonly known as the Transportation Act; in other words, that before the State can exercise its police power in ordering the separation of grades at a railroad crossing of a public highway, our State Commission must first go, with hats in hand, to the Federal Commission and secure its consent to such order.

It is conceded that the appellant is an interstate railroad and as such is engaged in interstate commerce. It is argued by appellant that the requirement of the Transportation Act in reference to the issuance of securities by interstate railroad companies has so radically changed the law that the previous decisions of the Federal courts are not now controlling.

The evidence offered by the appellant does not sustain this contention.   Mr. Hermany, assistant general auditor of the appellant railway company, testified, in substance, that the company's bonded indebtedness is $280,417,000; that it has outstanding about $54,000,-000 in preferred stock.   Asked as to the earnings of the Rock Island system for the last year, witness said that after paying preferred stock dividends and all operating expenses and capital charges, "we had about $915,000 left."   In order to provide the funds to pay the $13,000 for the construction of the viaduct, witness said:   "We would have to borrow the money on short-term notes—it doesn't require the permission of the Commission to issue short-term notes, if they fall due in less than two years. . . . We might issue notes for a year and then go ahead and fund these notes then, and in that event we would have to apply to the commission. . . . If we make such application to the Interstate Commerce Commission we must show what the money has been spent for. . . . We must also show that the projects in connection with which we make the application are reasonable and necessary."

It appears from the record that on the construction of this viaduct the State will receive Federal aid and that the Federal Government insists that grades be separated at all crossings of primary roads with railroads.   The order requiring the separation of the grades is in harmony with the policy of the Federal Government.   In considering the requirement of the Transportation Act referred to in Railroad Commission of California v. Southern Pacific Co., 264 U. S. 347, 44 Sup. Ct. Rep. 380, TAFT, C. J., said:   "To be sure this provision only becomes operative when securities have to be issued, and would not, of itself, prevent action by a state commission until such securities are seen to be necessary; but the provision indicates the general congressional plan."

We think it clear that the facts as shown by the evidence do not bring this case within the provisions of the Transportation Act and that the State Commission had authority to make the order in question in the exercise of the undoubted police power of the State. Similar conclusions were announced in Chicago M. & St. P. R. Co. v. Railroad Comm., 204 N. W. (Wis.) 606, and Milhollan v. Great Northern R. Co., 204 N. W. (N. Dak.) 994.

IV.   The proposed structure consists of a reinforced concrete viaduct 112 feet long, with a forty-foot center span, and two end spans each thirty-six feet long.   The roadway is to be twenty feet wide, the vertical clearance above the track twenty-two feet, and the approaches, each 450 feet long, are to consist of earth embankments with six per cent grades.   The estimated cost, which is not

questioned, is: viaduct, $15,170.93; approaches, $24,491.72; total, $39,662.65.

It is contended that the Commission had no power to assess against the appellant one-third of the cost of the approaches which are outside of its right of way.

The approaches are necessary parts of the crossing, without which the viaduct would not be a crossing; it would be a useless obstruction. [American Tab. Co. v. Mo. Pac. Ry. Co.; 247 Mo. 437, 157 S. W. 502, and cases cited; State ex rel. M. K. & T. Ry. Co. v. Public Serv. Comm., 271 Mo. 284, 197 S. W. 56.] There is no merit in this contention.

V. It is further argued that since it appears that this is a Federal-aid project and the Federal Government pays one-half of the cost of the construction, the Commission had no power to assess against the appellant more than one-third of the remaining one-half of the cost which the State will be required to pay.

If appellant's theory be conceded, its conclusion is a *non sequitur*. Under the statutes and rulings cited it was within the power of the Commission to assess the entire cost of construction against the appellant. This primary road is a state highway; the Federal Government has not initiated nor undertaken its construction. The fact that the Federal Government has approved the construction of the proposed viaduct and will reimburse the State for one-half of the cost thereof, if found to have been constructed in accordance with the plans and specifications approved by the Secretary of Agriculture, does not appear to be a matter in which the appellant should be concerned. Relative to this contention, learned counsel for respondent say:

"Federal-aid funds are contributions from the United States Government to the several States for highway purposes. While for administrative purposes, and for the purpose of reserving a supervision over the actual expenditures, such funds are paid out only on individual-approved projects, the payments are made to the States, and charged against the annual Federal-aid fund allotments of the States. The whole scheme of the Federal Highway Act is well expressed in the title to the Federal Aid Act of July 11, 1916 (39 Stat. 355), 'An Act to Provide that the *United States Shall Aid the States* in the construction of rural post-roads.' A method of 'apportioning' the funds 'among all the States' is provided for (Sec. 4). Unexpended portions of the appropriation 'apportioned to any State' may be 'reapportioned' (Sec. 3). The funds 'apportioned among all the States' must be certified by the secretary to the state highway departments (Sec. 3). Payments are made to the state authority authorized 'to secure public funds of the State' (Sec. 6).

The repeated use in the Act of 1916, supra, of the terms 'allotment,' 'apportionment,' 'available to each State,' clearly shows the intent of Congress that each State was entitled, as of right, to its share of Federal-aid funds, subject only to such State complying with the other provisions of the act and the regulations of the Secretary of Agriculture. . . . Under the Federal Highway Act, the Highway Commission is vested with the discretion of determining upon what projects Federal aid shall be expended. While all Federal-aid money apportioned to the State is paid over only on account of individual—approved projects, the Highway Commission in the first instance selects the projects upon which it will apply the Federal-aid money. Subject only to the approval of the secretary as to each particular project, including plans and specifications therefor, the State selects all the projects upon which Federal aid is to be expended.''

Federal-aid funds allotted to the several States are gratuities; the allotment to the State of Missouri is state money, to be expended for the purposes and on the terms indicated in the act. There is no merit in this contention.

The judgment is affirmed. *Railey, C.,* not sitting.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.