STATE OF MISSOURI at the relation of WABASH RAILWAY COMPANY, a Corporation, Appellant, v. PUBLIC SERVICE COMMISSION.

STATE OF MISSOURI at the relation of WALTER S. FRANKLIN and FRANK C. NICODEMUS, JR., Receivers for WABASH RAILWAY COMPANY, Appellants, v. PUBLIC SERVICE COMMISSION.

STATE OF MISSOURI at the relation of CITY OF ST. LOUIS, a Municipal Corporation, Appellant, v. PUBLIC SERVICE COMMISSION.—100 S. W. (2d) 522.

Division Two, December 23, 1936.*

---

*NOTE: Opinion filed at May Term, 1936, August 20, 1936; motion for rehearing filed; motion overruled November 17, 1936; motion to transfer to Court en Banc filed; motion overruled at September Term, December 23, 1936.

*Nat S. Brown* and *Homer Hall* for Wabash Railway Company.

*Edgar H. Wayman* and *John G. Burkhardt* for City of St. Louis.

*James P. Boyd*, General Counsel, and *Daniel C. Rogers*, Assistant Counsel, for Public Service Commission.

232

WESTHUES, C.—This case originated with the Public Service Commission of Missouri. Three separate appeals were taken, but in reality they present only one case and will be treated as such. The appeal to this court is from a judgment of the Circuit Court of Cole County, affirming an order of the Public Service Commission which allocated the cost of abolishing grade crossings of the Wabash and Rock Island tracks and Lindell Avenue and Union Boulevard in the city of St. Louis, Missouri.

The Public Service Commission assessed sixty per cent of the cost against the city and forty per cent against the Wabash Railway Company. This order was affirmed on appeal by the circuit court. The City, the Wabash Railway Company, and Walter S. Franklin and Frank C. Nicodemus, as receivers of the Wabash, appealed. In the course of the opinion appellant, City of St. Louis, will be referred to as the City; the Wabash Railway Company as the Wabash; Walter S. Franklin and Frank C. Nicodemus as receivers and the Public Service Commission as respondent or the Commission.

The Wabash owns a line of railroad beginning at the Union Station in the city of St. Louis and running in a northwesterly direction through the City. The tracks enter Forest Park by a subway at Kingshighway, six blocks south of Lindell Avenue, and pass through the park in a northwesterly direction, emerging therefrom near the junction of Lindell Avenue and Union Boulevard. Kingshighway is immediately east of Forest Park and Lindell Avenue immediately north thereof.

A separation of the grade crossings at the junction of Lindell Avenue and Union Boulevard was effected by the project under discussion. In order to carry out this plan it was necessary to adjust the tracks of the Wabash for a considerable distance on both sides of the crossing. A separation of a grade by way of an elevation of the tracks on Grand Drive in Forest Park, and a pedestrian underpass, which had been constructed many years ago, was changed to a viaduct for the vehicular traffic and an overhead passageway for pedestrians. The tracks of the Wabash were depressed through the park, and embankments on each side thereof were constructed, obstructing the tracks from the view of the public visiting the park. The project extended from the west line of Kingshighway to a point nearly two blocks west of Union Boulevard. This project was only a part of a plan inaugurated by the City for eventually eliminating all grade crossings of the Wabash Railroad tracks and the streets traversed thereby west of Kingshighway.

The question of the plan of separation was settled in a prior case. The plan approved by the Public Service Commission was affirmed by this court in the case of State ex rel. Wabash Ry. Co. v. Public Service Commission, 306 Mo. 149, 267 S. W. 102. In that case the city submitted a plan to the Public Service Commission for approval, for the separation of a grade crossing at Delmar Avenue. But in the plan submitted by the City it was contemplated that in the future separations of grades were to be made of all grade crossings between Kingshighway and the City limits. The Wabash in that case also submitted a complete plan for the separation of all crossings between the points mentioned. The Wabash in that case vigorously fought the proposal of the City and insisted that the tracks should be elevated over the streets. The City's plan of depressing the tracks between Kingshighway and Delmar Avenue and elevating them from there westerly, was approved. The cost of the Delmar project was apportioned forty per cent to the City and sixty per cent to the Wabash. The order of the Commission in that case was approved by this court in December, 1924. The Delmar project was constructed. Subsequently in July, 1929, the City of St. Louis enacted an ordinance authorizing and ordering the separation of the grades at Union and Lindell from the tracks of the Wabash and the Chicago, Rock Island & Pacific Railway Co., which company will herein be referred to as the Rock Island. By this ordinance the City pro-

posed to the railroads that the City pay one-third of the cost and the railroads two-thirds. It may be well to state here that the Rock Island, under an agreement with the Wabash, uses the tracks of the Wabash through Forest Park. It may also' be stated that, by agreement between these two railroad companies, the Rock Island was to pay forty per cent of any amount that would be assessed against the railroad companies, as their part of the cost of effecting the separation of the grade crossings. Therefore, in its order the Public Service Commission assessed the entire cost apportioned to the railroads against the Wabash.

The railroad companies rejected that part of the City's proposal pertaining to the question of the cost and elected to submit that question to the Public Service Commission. The City thereupon submitted a plan of separation, which was in fact substantially a part of the plan previously submitted and approved in the Delmar case. On April 28, 1930, the Commission approved the plan and granted permission to construct the viaduct as proposed by the City. The apportionment of the cost was not considered at that time. The project was completed. Both, the Wabash and the City participated in the construction work. On June 16, 1932, application was made to the Commission to apportion the cost between the various parties interested.

The Wabash and the City each submitted items of expense to be allowed by the Commission as a part of the cost of completing the project. Many of these items were contested before the Commission. The items, as contained in the report of, and as allowed by the Commission, are as follows:

"A summation of the above findings is as follows:

"Expenditures by the City properly chargeable to this grade separation project.

| | | | |
|---|---|---|---|
| "Item | 1. | Relocating and Lowering of Blackstone Sewer | $ 46,829.67 |
| Item | 2. | Grading | 70,298.47 |
| Item | 3. | Drainage system | 32,012.14 |
| Item | 4. | Sodding | 18,984.85 |
| Item | 5. | Bridges | 118,601.20 |
| Item | 6. | Paving | 114,031.70 |
| Item | 7. | Stone Railings | 7,630.00 |
| Item | 8. | Reinstalling Lighting System | 13,081.65 |
| Item | 9. | Relocating Water Mains | 19,382.65 |
| Item | 10. | Engineering Expenditures | 39,631.88 |
| Item | 11. | Land Purchased | 14,004.80 |
| Item | 12. | Damages Paid and Alterations made to Private Property | 5,242.40 |
| Item | 13. | Interest—Not Allowed | ....... |
| Item | 25. | Total Expenditures by City | $479,730.93 |

"Expenditures by the Railways properly chargeable to this grade separation project.

"Item 14. Engineering Expenditures Made by the Railways ..................................$ 7,806.53

Item 15. Railway Land North of Park Used for Track Depression ................................. 55,000.00

Item 16. Grading at Kingshighway Tunnel and for Side Ditches ............................ 14,101.75

Item 17. Original Grading for Old Railroad Embankment—Not Allowed ........................ ........

Item 18. Sub-Grade Drainage System .............. 10,962.71

Item 19. Temporary Tracks and Facilities and Maintaining Operation During Construction .... 14,179.20

Item 20. Removing and Rebuilding Permanent Tracks 88,419.72

Item 21. Automatic Block Signals, Telephone and Telegraph Lines and Safety Devices ....... 13,059.87

Item 22. Maintenance of New Roadbed and Track Capitalized—Not Allowed ...................... ........

Item 23. Removing Grand Drive Bridge ............ 982.85

Item 26. Total Expenditures by Railways ..........$204,512.63

"Expenditures by Western Union properly chargeable to this grade separation project.

"Item 24. Changing Western Union Wires ..........$ 8,759.99

Item 27. Total Expenditures by Western Union .... 8,759.99

"Total Expenditures properly chargeable to this grade separation project.

Item 25. By the City ........................$479,730.93

Item 26. By the Railways ...................... 204,512.63

Item 27. By the Western Union .................... 8,759.99

Total ...................$ 693,003.55

"The Commission therefore finds that the amount of $693,003.55 is properly chargeable to this grade separation project and should be allowed in full."

The Wabash claimed a total credit of $354,677.35; the City a total of $560,197.09.

We will first dispose of a few preliminary questions. The Wabash insists that the Commission had no authority to assess any of the cost of improvement in Forest Park against the railroad company because of an agreement referred to as the tripartite agreement. This agreement has been before the courts on a number of occasions. The most important of these was a controversy in the case of Joy v. St. Louis, 138 U. S. 1. The agreement was also considered in the Delmar crossing case, supra. [See State ex rel. v. Pub.

Serv. Comm., 306 Mo. 149, 267 S. W. 102, 1. c. 108, 109.] By virtue of this agreement the predecessor in title to the Wabash agreed that other railroads should have the right to use the tracks through Forest Park, thus restricting the number of railroad tracks in the park. That was the controversy in the Joy case. The Supreme Court of the United States with reference to this said. See 138 U. S. 1. c. 51.

"Under the tripartite agreement, the right of way through the park was obtained by the Kansas City company, and, in consideration of the covenants contained in paragraph 9 and other paragraphs of that agreement, $40,000 were expended by the Park Commissioners in aid of the construction of the railroad through the park, upon the right of way granted. Things were to be done by each party for valuable considerations to be paid by one to the other."

The agreement was held to be a binding contract.

The Wabash contends that by that agreement the City obligated itself to pay for the cost of all work to be done in the future in Forest Park. The portion of the agreement relied upon reads as follows:

" ' . . . And it is further expressly covenanted and agreed that all and every part of the work, its kind, description and extent, to be performed by either of said parties of the second or third parts, is hereinabove expressed, and neither of said parties shall be held or required to do or perform any other or further work and conditions than those hereby definitely set forth.' "

The parties to that contract were described in the fore part of the agreement as follows:

" 'This Agreement, made this eleventh day of August, 1875, by and between the Commissioners of Forest Park, of the City and County of St. Louis, Missouri, party of the first part, and the St. Louis County Railroad Company, its successors or assigns, party of the second part, and the St. Louis, Kansas City and Northern Railway Company, its successors or assigns, party of the third part:' "

The contract provided in detail as to how the railroad tracks should be constructed through the park. Note the following paragraph:

" 'Third. The slopes of said excavations and embankments shall be sodded or sown with grass by said party of the second part, or its assigns, and the ties neatly covered, and all shall be so kept and maintained by said party of the second part, or its assigns, and in case of failure so to do by said party of the second part, or its assigns, the said Park Commissioners may do so at the expense of said party of the second part, or its assigns; provided, however, that in case said Park Commissioners desire to have said slopes of the excavations and embankments constructed at a gentler slope, or less steep than that required by said party of the second part, or its successors or assigns, said Park Commissioners may do so at their own cost and expense of additional construction and maintenance.' "

It is our opinion that the portions of the contract quoted and relied upon by the Wabash have no application to the present project. The agreement detailed what each of the parties was to do in the building of the railroad through the park. The clause under discussion was merely a safeguard to the railroad company, that in case the City desired other work, not mentioned in the contract, to be done in the park in carrying out the project then under construction, it was to be paid for by the City. In other words that contract covered the building of the railroad through the park at that time and the work to be done in connection therewith and nothing more. This, to us, seems so self-evident that we dismiss this point without further consideration.

Next it is urged by the Wabash that Grand Drive and Pedestrian Way are not public highways and, therefore, all work performed in changing the separation of the crossings from underpasses to a viaduct and an overhead passageway for vehicular and pedestrian travel should be paid for by the City; also that the Commission was without jurisdiction to assess any of such cost against the railroad. To this we cannot agree. A road or a highway is nothing more than a strip of ground set aside, improved and dedicated to the public for use as a passageway. The fact that a road is located in a public park is immaterial. It is just as necessary to have driveways, boulevard or streets, which may all be referred to as highways or roads, in a park as it is to have such roads or streets in the business district of a city. [Kennard v. Eyermann, 267 Mo. 1, 182 S. W. 737, l. c. 739 (1, 4).] There is evidence in the record that Grand Drive and Pedestrian Way have been used by the public as roadways for many years. They were improved at public expense and possess all the characteristics of public highways. They were so recognized by everyone concerned. We, therefore, hold that the Commission possessed jurisdiction to apportion the cost of the viaduct and the underpass between the various parties affected. It must also be remembered that the improvement in Forest Park was made necessary by reason of the separation of the grades at Union and Lindell. It was a part of that project, and hence under the jurisdiction of the Commission.

The City urged that the Wabash agreed to the plan of the grade separation proposed by the City, and therefore the Commission in apportioning the cost should have given no consideration to the cost of the Wabash plan of track elevation. The Wabash contends that it did not agree. We are of the opinion that the contention of the Wabash must be sustained. The Wabash vigorously fought the plan of the City and carried the question to the Supreme Court of the United States. [See Missouri ex rel. Wabash Ry. Co. v. Pub. Serv. Comm., 273 U. S. 126, 47 Sup. Ct. 311.] Therefore, the Wabash sub-

mitted, perhaps unwillingly, only when it was useless to further litigate the question.

The city contends that if the Commission was authorized to give any consideration to the Wabash plan in allocating the cost, then the case should be remanded to the Commission for a determination of the cost of the Wabash plan. In the Delmar case the Commission did examine the Wabash plan sufficiently to determine that the City's proposal should be adopted. Perhaps the Commission did not determine the exact cost of the Wabash plan. It was found that the enormous damage (which was probably noncompensable) to the residental district and Forest Park, by an elevation of the tracks, was a sufficient reason for rejecting the plan. The finding of facts and orders of the Commission in the Delmar case were before the Commission in the present case, and therefore it was unnecessary to again go into detail as to the advantage or disadvantage of the two proposals. In the Delmar case the Commission gave consideration to the cost of the track elevation plan and this action was approved by this court. Note what was said in 306 Mo. 1. c. 173, 267 S. W. 109:

"All things considered, we hold that while the city plan at Delmar is, perhaps, not so entirely perfect and desirable as the railroad plan for its purposes, we cannot see that there is any substantial difference to the railroad, which plan is adopted, except as to the cost. We hold the Wabash plan is destructive of the interests of a large number of people in the vicinity who would be left without redress, as well as to the general public, by impairing and marring the beauty of perhaps the most attractive residential district and park in the city of St. Louis. While, therefore, the city plan is or may be substantially more expensive than the Wabash plan, as assumed by the Commission, it does the minimum injury to the city and its inhabitants, and is just to all concerned. Any injustice to the railroad on account of its greater cost is fully met in our judgment by the imposition of forty per cent of the cost upon the city of St. Louis, by the order of the majority of the commission.

The question having been adjudicated in that case it need not be considered here, since this is actually a part of a complete plan of separation which was before the Commission and this court in the Delmar case.

The Public Service Commission included in the total cost of construction to be apportioned all items which it deemed necessary to complete the project. It took into consideration the fact that the project was being constructed in one of the finest residential districts of the City and also adjacent to and through Forest Park. The Commission excluded the cost of certain items presented by the City which the Commission found were not necessary but were constructed for purely ornamental purposes. The Commission, however, did include in the total cost such items as sodding of the side slopes and

tops of the embankments constructed adjacent to the tracks through the park. The Commission in its finding made the following comment;

"The Commission found these items a proper part of the project. The Commission is of the further opinion that due to its location within a park frequented by thousands of people, the side slopes of the approaches and the screening embankments should have been sodded."

The Commission in allowing the cost of the screening embankments made the following comment:

"These screening embankments were sodded and blend in with the general appearance of the park. The Commission is of the opinion that they are a necessary part of the grade separation. Had they not been constructed it would undoubtedly have been necessary to construct right-of-way fences of an ornamental design to keep the casual trespasser off of the railway tracks. The railways claim, and it is not denied, that groups of boys now cross over the embankments and the tracks. However, the Commission feels that these screening embankments offer an obstruction and are of benefit in protecting users of the park now that the tracks are on the natural ground level for so great a distance. This Commission in previous decisions has adhered to the view that the surrounding neighborhood should be taken into consideration in the construction of any utility structure, to the end that it might not be unsightly or a depression upon surrounding values. Undue ornamentation should not be forced or allowed, but in the present instance the Commission is of the opinion that screening embankments were a proper method of public protection and in keeping with the surrounding territory."

We have quoted the above excerpts from the finding of the Commission to support our conclusion that the Commission with painstaking thoroughness segregated the items to be allowed and disallowed as proper costs of the project. In the briefs, under points and authorities, the Wabash, as well as the City, failed to present directly any question of the correctness of any particular item allowed or disallowed by the Commission. The apportionment of the total cost, as made by the Commission, and the method used by the Commission in apportioning such cost were attacked in various ways by both parties. As a starting point, we take the total cost, as allowed by the Commission, and determine if the order of the Commission in apportioning sixty per cent of the cost against the City and forty per cent against the railroads was unreasonable or unlawful.

The Wabash argues strenuously that the separation of the grade was made primarily for the convenience and benefit of the traffic on the highways and that the per cent of cost of the improvement assessed against the railroads was grossly out of proportion to benefits received by them. The Commission in its finding of facts stated:

"In the main there has been a slight increase in safety to the gen-

eral public and a decided increase in convenience to the highway using public.''

The Commission also found:

''There have been but few accidents at the Union-Lindell grade crossing, but the great increase in automobile traffic over these highways has made the crossing gates no longer fully adequate for complete protection. The highway using public further benefits by having an annoying and inconvenient delay in traffic removed. The railroads are not without benefit because the increased danger of an accident at this point, which might have resulted in heavy damage suits, has been removed.''

It is evident from the findings of the Commission, which were amply supported by the evidence, that due to crossing gates maintained by the Wabash the crossing was not very dangerous. The heavy traffic on the highway was compelled to stop for passing trains. This caused considerable delay, inconvenience and so called troublesome traffic jams, and materially interfered with the free use of the highway. By the law of necessity all traffic on a highway must give railroad trains the right of way. The Wabash introduced evidence showing that thirty-two railroad movements passed over the crossing daily. Of these, twenty-three were passenger trains. The vehicular traffic showed the lowest number of movements to be between three and five A. M., when about fifty passed over the crossing. The highest peak was reached between five and six P. M., when about one thousand eight hundred and fifty passed over the crossing. The tabulation showed that between the hours of five and nine P. M. five passenger trains, a switch engine and nearly seven thousand vehicles passed over the crossing. This is not such a case, but suppose a crossing was considered entirely safe because gates and watchmen were maintained by the railroad company, and let us further suppose that due to the number of trains passing over the crossing it materially interfered with the heavy traffic over a highway, would it be unlawful in such a case to assess a part of the cost of separating the grade crossing against the railroad? The separation in such a case would be for the benefit of the traffic upon the highway and not the railroad, yet the inconvenience created would be due entirely to the presence of the railroad. In such a case it certainly would not be unreasonable to assess against the railroad at least a part of the cost of restoring the usefulness of the highway. In the cases of State ex rel. Alton Ry. Co. v. Public Service Commission, 70 S. W. (2d) 52, 334 Mo. 985, and State ex rel. Alton Ry. Co. v. Public Service Commission, 70 S. W. (2d) 57, 334 Mo. 995, cited by the Wabash, structures separating grade crossings were in existence. These were found to be inadequate due to the increase in travel. The railroad was compelled to pay a part of the cost. Note what this court said in 334 Mo. l. c. 1000, 70 S. W. (2d) 57, l. c. 60 (5-6):

"Elimination of danger of collision between vehicles and trains and benefit to the railroad because of that or other reasons is to be considered in proportioning costs, but these matters are not alone controlling. Nor is benefit the fundamental consideration in proportioning expense. The true basis of apportionment of the cost has been declared by this court to be the extent to which the presence of the railroad at the place enhances the cost of a necessary improvement. [State ex rel. Kansas City Terminal Railroad Co. v. Public Service Comm., 308 Mo. 359, 272 S. W. 957.] If the presence of the railroad is the sole cause of an improvement necessary for the public safety, it may be required to pay the entire cost. [Chicago, Rock Island & Pacific Ry. Co. v. Public Service Comm., 315 Mo. 1108, 287 S. W. 617.]"

So in State ex rel. M. K. & T. Ry. Co. v. Public Service Commission, 271 Mo. 270, 197 S. W. 56, court en banc, an existing subway was found inadequate and the major portion of the cost of enlarging the structure for the sole purpose of accommodating the travel upon the streets was assessed against the railroads. This court in the course of the opinion said:

". . . but the safety of passing trains is only one of the elements to be considered in matters of this kind. It is not the sole or controlling element. The convenience and necessities of the traveling public using Rollins Street must likewise be considered."

We see no distinction in principle between those cases and cases where the presence of a railroad renders a street inadequate to accommodate the traveling public. The Wabash has cited the following authorities to support its contention that to assess against the railroad any part of the cost of providing convenience for highway traffic is a denial of due process.

"Article XIV, Constitution of the United States; Section 21, Article II, Constitution of Missouri; Nashville, C. & St. L. Ry. v. Walters, 294 U. S. 405, 55 Sup. Ct. 486; Southern Ry. Co. v. Virginia, 290 U. S. 190, 196; Chicago, St. P., M. & O. Ry. Co. v. Holmberg, 282 U. S. 162, 167; Lehigh Valley Railroad v. Commissioners, 278 U. S. 24, 33, 49 Sup. Ct. 69; Great Northern Ry. Co. v. Cahill, 253 U. S. 71, 73; Missouri Pacific Ry. Co. v. Omaha, 235 U. S. 121, 127; Missouri Pacific Ry. Co. v. Nebraska, 164 U. S. 403, 414; State of Washington ex rel. Oregon Railroad & Navigation Company v. Fairchild et al., 224 U. S. 510, 529."

We have carefully read these authorities. They do not apply to the situation at hand. The tabulation made by the Wabash of the traffic upon the highway conclusively showed that the greater per cent of the traffic was of a local nature. This tabulation disclosed that the peak of the traffic every day was about the hours when the inhabitants of the suburban territory went to, and returned from their daily labors. The case of Nashville, C. & St. L. Ry. v. Walters

comes nearest of all the cases cited to being an authority supporting the contention of the Wabash. The separation in that case, however, was not ordered primarily to promote safety, nor was there an inconvenience to the traveling public at the grade crossing. Note what the court said:

"The traffic on that highway was, and is small. The grade crossing has presented no serious interruption to traffic."

Again the court said:

"The underpass was prescribed, not upon consideration of local safety needs, but in conformity to general plans of the Federal and State highway engineers, as being a proper engineering feature in the construction of a nation-wide system of highways for high-speed motor vehicle transportation."

The statute of the State of Tennessee required one-half of the cost of the grade separation to be assessed against the railroad. The railroad challenged its constitutionality. In obedience to the statute the Commission had assessed one-half of the cost against the railroad. The Supreme Court of the United States held that the Commission and the State courts should have determined from all the facts and circumstances whether an assessment of one-half of the cost was unreasonable, and indicated that if it was a lesser sum should be levied irrespective of the provisions of the statute. In other words if the statute required an unreasonable amount to be paid by the railroad the statute would be unconstitutional under the due process clause.

In the case before us the Commission permitted all parties interested to introduce evidence to support their various contentions. The Commission gave due consideration to this evidence in its finding of facts and based its conclusions upon the facts found. It was not hampered by any statute, as was the Tennessee Commission in the case just discussed. The extent to which the railroad used the tracks in comparison with the use of the streets by vehicular traffic was shown in such detail that the city complained. In its brief in this court the City charges that the Wabash went to the extreme in its tabulation of converting pigs into, and comparing them with railroad passengers. The converse was not attempted. The decrease in the number of passengers on the railroads and the increase of vehicular travel over the crossing was shown in detail. So in this case, in assessing forty per cent of the cost of the separation against the railroads the Commission considered the case from every angle. We deem the finding of the Commission to be in harmony with the Walters case, supra.

In the Delmar crossing case the Wabash was assessed sixty per cent and the City forty per cent of the cost of the project. The Wabash in that case earnestly insisted that its plan should be adopted. A minority report, filed by a member of the Public Service Commission, suggested that the Wabash plan should be approved and also sug-

gested an assessment against the Wabash of a much larger per cent of the cost than the amount assessed by the majority report. Yet the Wabash insisted that the courts should hold the minority report valid and the majority report invalid. Taking into consideration the injury that would have been imposed upon the city by the Wabash plan, the court in that case held that the action of the Commission in approving the City plan was not unreasonable; also that sixty per cent of the cost assessed against the Wabash was proper. We are of the opinion that in this case an assessment for forty per cent of the cost against the railroad does not exceed the amount which could properly be charged to the railroads under the Wabash plan. Note what was said in the Delmar case, 306 Mo. l. c. 172, 267 S. W. 102 l. c. 108, 109 (10):

"If the Wabash plan in this case were adopted, it would, in our judgment, damage without redress, the vicinity many thousands of dollars by defacing and disfiguring it, and it would not be unjust to impose the whole cost thereof upon the railroad and no part thereof upon the city.

"So as to the complete plan of the city as to eliminating all grade crossings south of Delmar Boulevard through Forest Park to Kingshighway, if the cost of the city plan, which in our judgment, and that of the commission, is much less destructive of the attractiveness and value without need for recompense or remedy, of the beautiful residence district and Forest Park, exceeds the cost of the Wabash plan, *which is a matter of grave doubt in the record*, the commission has power to impose such part of the cost on the city as to absorb all the extra cost of its plan, and thereby prevent all injustice to the railroads." (Italics ours.)

In view of these decisions, both of this State and those of the United States Supreme Court, cited by the Wabash, the order of the Commission in assessing against the railroads forty per cent of the cost of the project constructed, cannot be said to be unjust, unreasonable or unlawful.

The Wabash insists that the Commission should not have allowed, as an item of expense, the cost, amounting to $19,382.17, of relocating the water mains. It insists that this amount should have been borne by the water department of the City of St. Louis. The water plant is owned by the City, and to have omitted this item of expense from the total cost of the project would have been the same as if it had been assessed against the city. The relocation of the water mains was made necessary by separation of the grades. The Commission was, therefore, justified in allowing this item as a part of the total cost.

We have disposed of all points briefed by the appellant, Wabash, and will now turn our attention to some points presented by the City. The City in its brief stated:

"Where the crossing of a public street or highway at grade by railroad endangers human life, and of itself makes necessary the separation of the grades, the entire cost thereof may be assessed against it."

The following cases were cited:

"Erie Railroad Co. v. Bd. of Pub. Utility Comrs., 254 U. S. 394, 41 Sup. Ct. 169, 65 L. Ed. 322; State ex rel. Wabash Ry. Co. v. Pub. Serv. Comm., 306 Mo. 149, 267 S. W. 102, 108; American Tobacco Company et al. v. Missouri Pac. Railroad Co. et al., 247 Mo. 374; Railway Co. v. Pub. Serv. Comm., 287 S. W. 619; State v. Pub. Serv. Comm., 308 Mo. 374, 272 S. W. 961; Railway Co. v. Omaha, 235 U. S. 121; Railway Co. v. Puget Sound and Willapa Harbor Ry. Co., 250 U. S. 332; Railway Co. v. Pub. Util. Commrs., 254 U. S. 394."

A reading of the opinions of the United States Supreme Court in the cases cited will disclose that the court merely held that assessing the entire cost of the grade separations against the railroads in the cases involved did not violate the due process clause of the Federal Constitution. In Mo. Pac. Ry. v. Omaha, 235 U. S. 121, l. c. 130, the court said:

"The Constitution of the United States requiring that no State shall deprive any person of life, liberty or property without due process of law, has not undertaken to equalize all the inequalities which may result from the exercise of recognized state authority. In the exercise of the police power, it may happen, as it often does, that inequality results which the law is powerless to redress. It is only in those clear and unmistakable cases of abuse of legislative authority that the court is authorized, under sanction of the Federal Constitution, to enjoin the exercise of legislative power."

It will, therefore, be noted that while in those cases it is held that under certain circumstances the entire cost of a separation of a crossing may be assessed against a railroad it does not follow that it must be done. The Missouri cases cited recognized that rule, but the Missouri Commission and the courts have attempted to make an assessment of the cost upon a more equitable basis. It will be noted that in none of the cases cited from Missouri was the entire cost assessed against the railroad, except in the case of State ex rel. Kansas City Terminal Ry. Co. v. Public Service Commission, 308 Mo. 359, l. c. 374, 272 S. W. 957, l. c. 961. That was the Oak Street viaduct case in Kansas City, where the railroad and the city entered into a contract and for a valuable consideration the railroad agreed to bear the entire cost. The Wabash case cited was the Delmar crossing case and only sixty per cent of the cost was assessed against the railroad. In the case of Chicago, R. I. & P. Ry. Co. v. Public Service Commission, 315 Mo. 1108, 287 S. W. 617, only one-third of the cost of the viaduct was assessed against the railroad. Note what this court said in the course of its opinion. 287 S. W. 617, l. c. 619.

"In the case under consideration, it is the presence of the railroad track which makes necessary the construction of the viaduct. Take away the railroad and there would be no more need or occasion for a viaduct than for a Chinese pagoda. Hence, under the rulings just referred to, the necessity for the overhead crossing being caused solely by the railroad track, the commission with entire propriety might have apportioned the entire cost of the construction and maintenance of the viaduct to the railroad company."

Many other cases, approved by this court, could be cited wherein the Missouri Public Service Commission assessed substantial portions of the cost of building viaducts and underpasses in effecting separation of grade crossings against municipalities or the State. Note the equitable adjustment that was made in the case of State ex rel. and to Use of Kansas City Southern Ry. Co. v. Public Service Commission, 30 S. W. (2d) 112, 325 Mo. 862.

Under the facts, as disclosed by the record in this case, it would have been grossly unjust to have assessed the entire cost against the railroads. The City devoted a great portion of its brief to urging that the so called "user basis" theory, or the theory of "comparative use," or of "relative benefits" either to the railroads or the public, were not proper methods in arriving at a proper allocation of the cost. It insists that the extent to which the presence of the railroad at the point of crossing creates the danger and enhances the cost of elimination of the crossing is the proper basis upon which to apportion the cost. That theory may be proper in certain cases, where the only purpose of building a structure is a separation for the purpose of eliminating a dangerous crossing. The case under consideration, however, is peculiar in itself. Of all the cases cited in the briefs and in none that have come to our attention was there a situation, as we have here, presented to a commission or a court. It was entirely proper in this case for the Commission to consider the evidence of the amount of traffic upon the highway and the railroad to ascertain the degree of danger which existed at the crossing and also the inconvenience that was eliminated by the separation of the crossing. Benefits which the various parties derived as the result of the project were of special importance in this case. The purposes of building the present viaduct were at least three-fold: First, the elimination of a dangerous crossing; second, the elimination of the inconveniences and delay of the vehicular traffic passing over the crossing; third, but not by any means of minor importance, the beautification of the surrounding territory, including one of the finest public parks in the world. To accomplish this latter purpose the city made a gallant fight. We are of the opinion that the City deserves to be congratulated upon its success. A separation of a crossing often results in a detriment to the immediate neighborhood. The present project, however, is a vast improvement over the old situation. It has added magnificently to the

scenic beauty of Forest Park and the residential neighborhood. The viaduct serves as a separation of the crossing and also as an artistic entrance to the park. Depressing the tracks through the park and erecting screening embankments, which were sodded and beautified with shrubbery, resulted in a vast improvement over the pre-existing conditions. While it is true that in eliminating crossings a railroad may be compelled to erect structures that do as little harm as possible, it can hardly be argued with sincerity that a railroad should be required to go to the extent of making the extensive improvements that were made in this case. All these matters were before the Public Service Commission and were given due consideration in allocating the cost. The Commission did not apportion the cost upon the so called "user basis," or any other particular theory. Its report shows that the case was considered from every angle. The allocation was based mainly upon the theory of what was just and equitable under all the attending facts and circumstances. In view of the unusual benefits to the City the apportionment to it of sixty per cent of the total cost cannot be said to be unreasonable or unlawful.

The City urges that forty per cent of the amount apportioned to the railroads should have been apportioned directly to the Rock Island. The Rock Island was a party to the proceedings and filed an answer. The Wabash and the Rock Island entered into an agreement that of the total sum to be allocated against the railroads forty per cent should be paid by the Rock Island. Because of this agreement the Public Service Commission apportioned the entire amount to be borne by the railroads to the Wabash. The City has not complained, and did not complain at the hearing, of the division of forty per cent to the Rock Island and sixty per cent to the Wabash of the amount to be assessed against the railroads, but its sole contention was, and is, that the forty per cent agreed to be borne by the Rock Island should have been apportioned directly to the Rock Island and not to the Wabash. This, probably, because the Wabash was in receivership. We are of the opinion that the contention of the City must be sustained. The Public Service Commission had the authority and jurisdiction to determine what per cent of the sum that was to be apportioned to the railroads should be borne by the Rock Island and the Wabash. Since no contention was made by any party interested that sixty per cent and forty per cent were inequitable it would have been entirely proper for the Public Service Commission to have made the allocation in accordance with the agreement. The public was not directly interested in that agreement. The contract, however, was not binding on the City and the City had the right to demand that the portion to be paid by the Rock Island should be allocated directly to that company. The City in this case was entitled to be reimbursed to the extent that it contributed in excess of the amount apportioned to it. The City should not be compelled to

look to a company in receivership for reimbursement due by a solvent company. This will require a remanding of the case to the Public Service Commission to make a reallocation in accordance with this opinion.

■ The receivers of the Wabash contend that they were not proper parties to this proceeding because the permission of the Federal Court, wherein the receivership proceedings were pending, was not obtained. This identical contention was decided adversely to the contention of the receivers, by the court en banc, in the case of State ex rel. M., K. & T. Ry. Co. v. Public Service Commission, 271 Mo. 270, 197 S. W. 56, l. c. 60 (6).

The judgment of the circuit court, affirming that part of the order of the Commission apportioning the cost to be borne by the Rock Island against the Wabash, must be reversed with directions to remand the case to the Commission to apportion the cost in a manner not inconsistent with this opinion. In all other matters the judgment of the circuit court, approving the orders of the Commission, must be affirmed. It is so ordered. *Cooley* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.