STATE of Missouri, at the Relation of the CITY OF NEOSHO, Newton County, Missouri, Respondent,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Appellant.

No. 49447.

Supreme Court of Missouri, Division No. 1.

May 13, 1963.

Glenn D. Evans, Gen. Counsel, Thomas J. Downey, Asst. Gen. Counsel, Missouri Public Service Commission, for appellant.

C. Wallace Walter, Buell F. Weathers, Mann, Walter, Powell, Burkart & Weathers, Springfield, amicus curiae, for St. Louis-San Francisco Ry. Co.

COIL, Commissioner.

The Missouri Public Service Commission has appealed from a judgment holding a portion of its order relating to the apportionment of the cost of an underpass unreasonable and unlawful and further adjudging all other portions of the order reasonable and lawful. As a result of a complaint and a preliminary investigation by a Commission employee of the place where McCord Street crosses the single track of the St. Louis-San Francisco Railway Company at grade in Neosho, the Commission ordered a formal hearing. A hearing was held in Neosho on November 18, 1960, and in Jefferson City on February 16–17, 1961. At both, many witnesses testified and considerable evidence was adduced upon the various issues then involved. Thereafter on May 31, 1961, the Commission issued its report and order in which it reached the conclusion that the grade crossing should be permanently discontinued and that if a crossing was to exist at that point, it should be by underpass; and the Commission advised the parties that if they desired to be heard further "as to the final allocations and costs of the improvement the matter will be set for further hearing and the Railway Company will be required to submit detailed plans and state the final type of crossing chosen." The Commission's order required the Railway to submit within ninety days more detailed plans and specifications for an underpass

of the type therein described and further that 75 per cent of the costs of whatever type of underpass was finally chosen should be borne by the City and 25 per cent by the Railway. The Commission retained jurisdiction for further hearing or ruling as the circumstances might indicate.

The City, apparently not wishing any "further hearing * * * as to the final allocations and costs of the improvement," filed its motion for rehearing which was overruled and thereafter sought review of the order pursuant to the provisions of Section 386.510.[1]

The circuit court granted the Railway leave to intervene, reviewed the record and adjudged that that portion of the Commission's order which provided for the apportionment of costs was unreasonable and unlawful and that all other parts of the order were lawful and reasonable.

██ The Commission only has appealed. Railway, with leave, has filed an amicus curiae brief. Respondent City has filed no brief in this court, apparently choosing to stand upon its motion to dismiss Commission's appeal for alleged failure to comply with S.C. Rule 83.05(e), V.A.M.R.; respondent's contention being that appellant failed under its points relied on to state what actions or rulings of the court were claimed to be erroneous and why the court was wrong in any ruling sought to be reviewed. Taking into account the type of proceeding involved and examining appellant's points and authorities in the light thereof and in view of appellant's suggested addition to its brief complying in full with the requirements of the rule, respondent's motion to dismiss is overruled.

Appellant contends that the sole issue on this appeal is whether the apportionment of costs, 75 per cent to the City and 25 per cent to the Railway, is reasonable and lawful under the evidence adduced. While the City made other contentions in its motion

1. All section citations refer to sections in RSMo 1959 and V.A.M.S.

for rehearing, as well as in its brief filed with the Commission prior to the report and order, and while the appeal is from the entire judgment (including the part of the judgment which held portions of the order reasonable and lawful), yet, as noted, appellant in its brief attacks only that portion of the judgment relating to apportionment of costs. Inasmuch as respondent has filed no brief, we proceed on the assumption that the City acquiesces in appellant's stated position that the sole issue for present decision is the reasonableness and lawfulness of the manner in which the Commission apportioned the cost of the proposed underpass.

█ The record at the time of the appeal affirmatively showed the amount in dispute (difference between the portion of the cost City contended it should pay and 75 per cent of the cost it was ordered to pay) exceeded $15,000 and, consequently, jurisdiction is in this court.

The railroad track in question enters the City at the north and curves generally west. The track runs southwest at the point where McCord, an east-west street, crosses it. People had crossed the track there for a long time; in years past for the purpose of picnicking in the area of a spring which was located northwest of the track. It was conceded that the crossing was hazardous and that the danger created thereby should be eliminated. The Railway took the position that the crossing should be closed and the City that some type of underpass should be established. The Commission entered its temporary order closing the crossing immediately after the first hearing and it is reasonable to assume that the crossing has remained closed ever since.

An examination of the record before the Commission leaves no doubt that the idea and desire for an underpass originated with Mr. Joe Roark, who planned to and did develop a subdivision called Western Hills Addition in the area immediately northwest of Railway's track. The subdivision, begun in 1954, as completed, consisted of 169 lots priced at $2,000 to $2,500 facing on several curving streets. It was improved with sewers and utilities. There have been eight houses built, seven of which were occupied at the time of the hearing. Most, probably seven, of those houses were located at about the center (east to west) of the subdivision. They ranged in price from $13,000 to $28,000. There is an entrance to Western Hills off U. S. Highway 71 which, at the place of entrance, runs in a northwest direction. Immediately across Highway 71 is the entrance to another subdivision known as Greenwood in which forty houses had been completed and most of them were occupied. They ranged in price from $11,000 to $14,000. There was some evidence that certain persons were purchasing unplatted property immediately north of Western Hills Addition.

One traveling from the business district of Neosho to Western Hills need not use the McCord crossing but can proceed on city streets west to Highway 71, then northwest on 71 through an underpass under the Frisco track in question to the entrance to Western Hills; or one could, from the same downtown location, travel north to Adams Street, thence through an underpass under the same Frisco track, thence north and west to Highway 71, and thence southwest to the entrance to Western Hills. There was evidence that from a designated downtown corner to the entrance to Western Hills was only two tenths of a mile farther via the highway underpass than via the McCord Street crossing. The entrance to Western Hills, of course, was at the western end of the subdivision and, consequently, from the same downtown location to the easternmost part of Western Hills would be considerably closer via the McCord Street crossing. From a designated downtown location to the seven houses located near the subdivision center it would be about one-half mile via the McCord crossing as opposed to one mile via the Highway 71 underpass. The Adams Street underpass (measured on the Railway's track) was 1,584 feet north of the McCord Street crossing and the Highway 71 underpass was one-

half mile southwest of the McCord Street crossing.

There was evidence that if a road was constructed from the eastern end of Western Hills north to Ried Road, people who might reside in the subdivision would have a close route to and from downtown via the Adams Street underpass. There was a dispute as to the general usability of the Adams Street underpass, the roadway being narrow and apparently the sight distances were not too good. But there was also evidence that the Adams Street underpass could be made safe by a straightening of City's street approaches.

The City's present limits did not extend any great distance either north or west of Western Hills. City adduced evidence that its council had determined there should be a safe crossing at McCord Street, preferably an underpass, in order that the City might develop in that direction; that the northwest section of the City was the only available section where sewage facilities and utilities had been installed; that a high school was contemplated in the area north of the subdivision; that it would be desirable for emergency vehicles to have access to the northwest section via a McCord Street crossing.

Mr. Roark's evidence indicated that his subdivision had been slow in developing because of no access via McCord Street, even though the record contains no satisfactory explanation as to why the subdivision (Greenwood) immediately across the highway from Western Hills apparently had developed comparatively rapidly.

 It is fair to say that the record before the Commission substantially supported the conclusions that the permanent closing of the McCord Street crossing would, of course, remove the danger to the traveling public; that it would be convenient to present and future residents of Western Hills as well as to others living in the northwest section of the City to have a safe crossing at McCord Street (although we note that if a crossing was of benefit to any substantial number of persons other than the residents of Western Hills, the main street in Western Hills would become a thoroughfare); that it would be of benefit to the City in its general northwestern development to have a safe crossing at McCord Street; and that while a McCord Street crossing would be convenient and desirable, there was no necessity for it in that present and future residents of Western Hills and of other northwest portions of the City had existing access to and from downtown Neosho through two underpasses, the use of which required relatively little additional travel. The City apparently recognized that the crossing at McCord Street, at least the underpass which it desired, was not a necessity because it requested the Commission to so frame its final order as to give the City a discretion as to whether to perform its designated part in the building of such an underpass, i. e., as we understand, give the City the choice to acquiesce in closing the McCord Street crossing or participate as finally directed in providing an underpass.

The Commission recognized the unusual fact situation which existed in this case and in its conclusions pointed out that because of the reasonable availability of other underpasses, the Railway should not be required to bear a great portion of the cost of another underpass, and the Commission explained that the apportionment of cost made in this case, 75 per cent to City and 25 per cent to Railway, was a departure from the Commission's usual practice to apportion a greater percentage of the costs of an underpass to railroad companies; but that the facts in evidence indicated the desirability of the apportionment made.

 The review of the evidence heretofore makes it apparent to us that the portion of the Commission's order here in question was supported by competent and substantial evidence upon the whole record and was therefore reasonable. State ex rel. Chicago, R. I. & P. R. Co. v. Public Serv-

ice Commission, Mo., 312 S.W.2d 791, 796 [3, 4]. The order was made in the lawful exercise of specific statutory authority granted to the Commission by Section 389.640 which, inter alia, vests in the Commission exclusive power to apportion underpass costs between a railroad and a city, and was therefore lawful. State ex rel. Chicago, B. & Q. R. Co. v. Public Service Commission, Mo., 334 S.W.2d 54, 57 [1–3].

In its brief before the Commission, the City took the position that this court had in effect prescribed a formula for determining the apportionment of costs in all railroad underpass cases. In support of that contention, City seized upon this language from State ex rel. Alton R. Co. v. Public Service Commission, 334 Mo. 995, 70 S.W.2d 57, 60 [5–8]: "The true basis of apportionment of the cost has been declared by this court to be the extent to which the presence of the railroad at the place enhances the cost of a necessary improvement. State ex rel. Kansas City Terminal R. Co. v. Public Service Comm., 308 Mo. 359, 272 S.W. 957. If the presence of the railroad is the sole cause of an improvement necessary for the public safety, it may be required to pay the entire cost. Chicago, Rock Island & Pacific Ry. Co. v. Public Service Comm., 315 Mo. 1108, 287 S.W. 617."

As demonstrated by that case and by cases prior to and following the cited case, this court has not attempted to fix (even if it lawfully could) an inflexible formula for cost apportionment, but, on the contrary, has indicated that the facts in a given case determine the apportionment to be made within the Commission's discretion. See State ex rel. and to Use of Kansas City Southern R. Co. v. Public Service Commission, 325 Mo. 862, 30 S.W.2d 112, 115 [2]; State ex rel. Wabash R. Co. v. Public Service Commission, 340 Mo. 225, 100 S.W.2d 522, 530, 531, 109 A.L.R. 754.

That portion of the judgment of the court below, adjudging "ORDERED. 2" of the Commission's order, dated May 31, 1961, in Case No. 14,555, unreasonable and unlaw-

ful, is reversed and the case is remanded for further proceedings consistent with this opinion.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All of the judges of the division concur.

STORCKMAN, Special Judge, concurs.