543 A.2d 371

The BALTIMORE & OHIO RAILROAD COMPANY

v.

Francis W. KUCHTA, et al.

No. 1331, Sept. Term, 1987.

Court of Special Appeals of Maryland.

July 8, 1988.

Certiorari Denied Oct. 11, 1988.

H. Russell Smouse (Kenneth D. Pack and Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., on brief), Baltimore, for appellant.

Richard K. Jacobsen, Chief Sol. (Neal M. Janey, City Sol. and Ambrose T. Hartman, Deputy City Sol., on brief), Baltimore, for appellee.

Argued before GARRITY, KARWACKI and POLLITT, JJ.

KARWACKI, Judge.

The Baltimore & Ohio Railroad Company (B & O) appeals from the decision of the Circuit Court for Baltimore City (Kaplan, J.) that B & O was liable to the City of Baltimore for the reasonable and necessary costs associated with the

reconstruction of Bridge 5A (the Bridge) which carries Washington Boulevard over the B & O tracks near Morrell Park. Judge Kaplan found that those costs totaled $946,430.58 and entered judgment in that amount in favor of the Mayor and City Council of Baltimore and its Director of Public Works, the appellees.

This dispute between Baltimore City and B & O arose in 1974, after an inspection incidental to the repair of Washington Boulevard by the Highway Department of the Baltimore City Bureau of Engineering revealed serious structural deterioration of the Bridge. The Department of Public Works of Baltimore City notified B & O that the Bridge required reconstruction. B & O denied that its responsibility for maintenance of the bridge extended to rebuilding. Recognizing that waiting for a resolution of the dispute over who would bear the cost of replacing the bridge would needlessly continue a potential hazard to the public, the City and B & O entered into an agreement in 1978 which permitted the City to enter B & O's property to reconstruct the bridge and provided that their dispute over who should bear the cost of the reconstruction would be resolved at a later date. Following the reconstruction of the Bridge in 1979, the appellees filed the instant case seeking reimbursement from B & O for the bridge reconstruction costs.

On December 20, 1985, the court granted a partial summary judgment in favor of the appellees, ruling that it was B & O's responsibility to reconstruct the Bridge. A hearing was ordered to determine whether the City had acted "unreasonably or arbitrarily in rebuilding Bridge 5A in the fashion it did and, if not, whether the costs incurred for doing so were unreasonable."

After a hearing on those issues, the court entered the judgment from which this appeal has been taken. B & O presents the following questions:

1. Whether the trial judge erred in holding the railroad to be responsible for reasonable and necessary costs of rebuilding and widening the bridge where the costs of constructing the existing bridge had been shared

by the railroad and government and the railroad was obligated only to "maintain" the existing bridge.

2. Whether the trial judge erred in holding the costs of the new bridge to be "reasonable and necessary" where there was overwhelming evidence that the existing bridge was repairable at a lower cost, and the undisputed evidence was that a smaller new bridge, at lower cost, would have served equally well.

3. Whether the costs of relocating utilities and traffic maintenance were reasonable and necessary where the undisputed evidence was that relocation costs had been and customarily are borne by the utility, and maintenance is customarily proportionate to the length of the project.

The events which give rise to this litigation date back to the early years of the 19th century. The construction of the Washington Road, the forerunner of Washington Boulevard, was authorized by the General Assembly of Maryland by ch. 78 of the Acts of 1812. Several years after the completion of the road, B & O was incorporated by ch. 123 of the Acts of 1826. Section 16 of that Act provided:

And be it enacted, That wherever, in the construction of said road or roads, it shall be necessary to cross or intersect any established road or way, it shall be the duty of the president and directors of said company so to construct the said road across such established road or way, as not to impede the passage or transportation of persons or property along the same; or where it shall be necessary to pass through the land of any individual, it shall also be their duty to provide for such individual proper wagon-ways across said road or roads, from one part of his land to the other.

In 1829, B & O extended its railroad to the present site of Bridge 5A. In order to cross the Washington Road, B & O dug up a section of the Washington Road and the embankment supporting it and laid its tracks across the excavated

portion of the road.  B & O then constructed a wooden bridge, named "Jackson Bridge," to carry the Washington Road over its railroad.[1]  This wooden structure was maintained by B & O until 1907.  At that time the structure, then located in Baltimore County,[2] was determined to be in a dangerously deteriorated condition by County Commissioners of Baltimore County sitting as its Highway Commission.  On August 29, 1907, an agreement was executed by B & O and the County Commissioners for the construction of a "steel structure resting on masonry foundations."  The B & O agreed to build the structure and Baltimore County agreed to contribute one-half the cost of construction, but no more than $5,500.00.  The agreement further provided that B & O would maintain the bridge at its sole cost.  The record is replete with references over the ensuing years to repair work done by B & O in response to complaints by the City.  Additional facts will be supplied where appropriate to the discussion of appellant's questions.

## I.

The court based its ruling that B & O was responsible for all necessary and reasonable costs of reconstructing Bridge 5A on the well settled common law principle governing the liability of a party who builds a structure to carry its road over the road of another.  Under this so-called "second comer" doctrine, the builder of a new way or road whose course intersects another way or road already in existence and use is responsible to repair the damage it made in crossing the first way or road including the construction of a bridge or viaduct, if necessary, and to bear the cost of maintaining the viaduct or bridge in a manner which insures the safety and convenience of the users of the first way or

---

1. Long, *Narrative of the Proceedings of the Board of Engineers of the Baltimore and Ohio Railroad Company*, p. 67 (1830).

2. By virtue of ch. 82 of the Acts of 1918, the site of Jackson Bridge was annexed by Baltimore City.

road. *Northern Central Railway Co. v. Mayor and City Council of Baltimore*, 46 Md. 425, 445–46 (1876).

B & O launches a two pronged attack on the court's reliance upon the second comer doctrine. First, it contends that the City's predecessor in interest, Baltimore County, abandoned its asserted common law right as first comer to the intersection of the railroad with the public way now known as Washington Boulevard by its 1907 agreement with B & O.[3] Alternatively, B & O argues that the second comer doctrine, if applicable, is not broad enough to compel rebuilding the bridge. We find no merit in either contention.

■ B & O asserts that, by entering the 1907 agreement, the County Commissioners of Baltimore County abandoned the common law rights that the county possessed as the first comer to the intersection in question. Thereafter, B & O asserts, the rights of the County and its successor in interest, Baltimore City, were governed by the terms of that agreement. Under that agreement, B & O posits, Baltimore County gave up any right it possessed at common law to insist that the cost of any necessary reconstruction of a bridge at the intersection would be borne solely by B & O. This argument overlooks the inability of a municipal government to contract away police powers delegated to it by the State to maintain its streets for the safety of the traveling public.

At the time of the 1907 agreement, the County Commissioners for Baltimore County, designated as the Highway Commission of Baltimore County, had been delegated the police power of the State to protect the safety of the public who used the roads in Baltimore County. Ch. 465 of the

---

**3.** The City contends that B & O failed to raise this argument in the court below and is therefore estopped from raising it on appeal pursuant to former Rule 1085 (present Rule 8–131(a)). We reject this argument since the issue was expressly addressed in the trial judge's memorandum opinion and order of December 20, 1985, granting partial summary judgment in favor of the appellees.

Acts of 1904. In § 189 of that Act, the General Assembly of Maryland directed:

> The said Highway Commission of Baltimore County shall have general charge of and control over all the public highways, roads, bridges, streets and alleys of the county; and it shall be the duty of the said commission to keep the same in proper condition of repair and reasonably safe for public travel, and to that end exercise a general supervision over the same throughout the county, and direct repairs and improvements thereto whenever it shall deem the same necessary or advisable for the public convenience or safety.

Included within the police power and responsibility then delegated by the General Assembly to the County Commissioners was the duty to enforce Baltimore County's common law right, as first comer to the intersection of the Washington Road and the railroad of the B & O, to require the B & O, as second comer, to provide a safe structure to carry the public road over its railroad. In *Eyler v. County Comm'rs of Allegany County*, 49 Md. 257 (1878), the Court of Appeals construed a statute conferring upon the County Commissioners the duty to "take charge of and control over the county roads and bridges." The statute furthermore provided the Commissioners with the necessary authority and power to discharge those duties for the public good. Eyler had been injured by the defective condition of a bridge which carried a public road over the Chesapeake and Ohio Canal. The bridge had been constructed by the canal company when it severed the public road in constructing its canal. The Court held that the Commissioners, by "neglect of their primary duty" in failing to exercise their power to force the canal company to maintain in good repair the bridge which the company had built across its canal, were the primary cause of Eyler's injuries and therefore liable for damages. *Id.* at 272. Although the commissioners were found negligent, the duty of the C & O Canal Company to maintain the bridge was recognized by the Court.

The commissioners then filed an action seeking indemnity for the judgment entered against them in favor of Eyler and their cost of defending that suit. In *C & O Canal Company v. Co. Commissioners of Allegany Co.*, 57 Md. 201 (1881), the Court affirmed the lower court's judgment in favor of the commissioners. The Court stated:

> And in regard to this identical bridge, this Court in the case referred to in 49 *Md.*, thus explicitly states the effect of previous decisions, and its own concurrence therewith: "It is therefore certain that the duty of maintaining and keeping this bridge in repair, is devolved from the Canal Company."

> It is simply for the additional security and convenience of the public, that the County Commissioners are held primarily responsible for the safe condition of the bridge, and not in anywise to lessen the obligation of the Canal Company to keep the same in repair.

*Id.* at 219.

We therefore hold that when the County Commissioners purported to give up Baltimore County's common law right to insist that B & O provide a safe bridge over the railroad constructed by B & O to serve its purposes, the County Commissioners failed in their duty to enforce the police power delegated to them by the Legislature. Baltimore County's common law right as first comer to the intersection of the Washington Road and the B & O railroad was essential to the protection of the safety of the travelers on the Washington Road. The attempt to give that right away was simply beyond the scope of their authority and therefore *ultra vires*. *Valentine v. Road Directors of Allegany County*, 146 Md. 199, 205–07, 126 A. 147 (1924); Annotation, 1 ALR 316 (1919). B & O gained nothing from this void contract. Baltimore County's right of first comer was unaffected thereby and passed intact to Baltimore City when the site of this railroad crossing was annexed by the City in 1918.

Similarly, the Supreme Court held, in *Northern Pacific Railway Co. v. Duluth,* 208 U.S. 583, 28 S.Ct. 341, 52 L.Ed. 630 (1908), that such a contract between the City of Duluth and Northern Pacific Railway Company was void and beyond the power of the city to make. 208 U.S. at 598, 28 S.Ct. at 346, 52 L.Ed. at 637. The charter of Northern Pacific imposed upon it the obligation as to highways, roads, and streets over which the railroad was constructed, "to keep the same in good condition and repair whether laid out after the building of the railroad or before." This obligation included the rebuilding of overhead bridges necessary for the public safety. The Court held the requirement that such bridges should be built at the expense of the railroad company was an exercise of the police power of the state and did not amount to the taking of property without due process of law. 208 U.S. at 593, 28 S.Ct. at 343, 52 L.Ed. 635. By the contract at issue in *Duluth,* the city had relieved the railroad of its duty under its charter to make repairs to a bridge, built at the expense of the railroad, which carried a road over a rail bed. The railroad company paid $50,000 for that concession. A later city ordinance, challenged in the case, reinstated the railroad's obligation of repair and rebuilding of bridges. The Court in upholding the ordinance held the city's earlier contract to be *ultra vires.* The Court reasoned:

In this case the supreme court of Minnesota has held that the charter of the company, as well as the common law, required the railroad, as to existing and future streets, to maintain them in safety, and to hold its charter rights subject to the exercise of the legislative power in this behalf, and that any contract which undertook to limit the exercise of this right was without consideration, against public policy, and void. This doctrine is entirely consistent with the principles decided in the cases referred to in this court. But it is alleged that at the time this contract was made with the railroad company it was at least doubtful as to what the rights of the parties

were, and that the contract was a legitimate compromise between the parties, which ought to be carried out. But the exercise of the police power cannot be limited by contract for reasons of public policy; nor can it be destroyed by compromise; and it is immaterial upon what consideration the contracts rest, as it is beyond the authority of the state or the municipality to abrogate this power so necessary to the public safety.

208 U.S. at 598, 28 S.Ct. at 346, 52 L.Ed. at 636–37.

The Supreme Court of Minnesota in *State v. Great Northern Ry. Co.*, 134 Minn. 249, 158 N.W. 972 (1916) applied the rationale of *Duluth* to facts similar to those in the case *sub judice*. The City of St. Paul had constructed its Seventh Street in 1860 across a ravine by cutting the banks and filling in the bottom. Subsequently, the predecessor of Great Northern laid track across Seventh Street, crossing at grade. In 1883 the railway company removed the fill from the ravine, lowered its tracks, and built a bridge to carry Seventh Street over the tracks. In 1916 the City of St. Paul brought an action to compel Great Northern to rebuild the Seventh Street bridge. Great Northern contended that the city had entered into a contract which provided that, whenever the city directed that a street be carried over the tracks of the company on a bridge, the construction work would be shared between the company and the city. The Minnesota Court held that "This contract clearly attempted to take from the city a part of its police power and was unquestionably void." *Id.* 158 N.W. p. 974.

■ We also reject appellant's alternative argument that the second comer doctrine did not impose upon it the duty of completely reconstructing Bridge 5A. *Central Ry. Co. v. Phil. W. & B.R. Co.*, 95 Md. 428, 444–45, 52 A. 752 (1902) emphasizes that the duty imposed upon the second comer to maintain the structure erected to cross the first comer's road or way is a continuing one and that the duty encompasses reconstruction or renewal of the structure, if neces-

sary. Accord: *Atchison R. Co. v. Public Util. Comm'n,* 346 U.S. 346, 74 S.Ct. 92, 98 L.Ed. 51 (1953); *Chicago & N.W. R. Co. v. Illinois Commerce Comm'n,* 326 Ill. 625, 158 N.E. 376 (1927); *State ex rel Wabash R. Co. v. Public Service Comm'r,* 340 Mo. 225, 100 S.W.2d 522 (1936). The court correctly concluded that B & O's duty as second comer to maintain the Bridge extended to bearing the cost of replacing the Bridge where rebuilding and not repairing the structure was the only reasonable alternative.

## II.

In challenging the trial court's determination that rebuilding Bridge 5A was reasonable and necessary, B & O invites us to weigh and compare the credentials of the various expert witnesses to determine the validity of the conflicting opinion evidence presented on this issue. We decline to do so. Rule 8–131(c) (former Rule 1086). This Court will review the evidence produced at trial in a light most favorable to the prevailing party, and if the trial court's determination is supported by substantial evidence it will not be disturbed on appeal. *Geo. Bert. Cropper, Inc. v. Wisterco,* 284 Md. 601, 620, 399 A.2d 585 (1979). There is adequate testimony in the record to support the court's conclusion both as to the necessity of replacement rather than repair of the Bridge and as to the reasonableness of the City's decision to construct a 120 foot span. The trial judge's decision to accept the testimony of the City's engineering experts over those hired by B & O is entitled to the deference which this Court gives to the trial court's better opportunity to judge the credibility of witnesses. *Progressive Casualty Ins. v. Ehrhardt,* 69 Md.App. 431, 439, 518 A.2d 151 (1986).

## III.

Finally, B & O complains that the court erred in allocating utility relocation and traffic maintenance costs to the

railroad. We do not agree. The judgment of the court was supported by substantial evidence as viewed in the light most favorable to the prevailing party. Rule 8–131(c); *Geo. Bert. Cropper, Inc. v. Wisterco, supra.*

■ B & O contends that Baltimore Gas and Electric Company was contractually bound to B & O to pay for its relocation costs and therefore that appellees impermissibly incurred them. The record reveals that when the City initially attempted to deny BG & E's claim for reimbursement, B & O stood by and allowed BG & E to press its claim against the City. In the words of the trial court:

> The City is entitled to all reasonable and necessary expenses in connection with the bridge repairs. The City paid BG & E's bill for relocation costs at a time when its right to require BG & E to relocate was dubious, and where there existed no contract between the City and BG & E regarding the allocation of such costs. B & O's present argument that BG & E simply had no legal right to be reimbursed is seriously undermined in the face of its inaction when asked for information about the dispute by BG & E.

■ In regard to the traffic maintenance costs, the record reflects a dispute as to the method of allocating traffic costs inasmuch as the Bridge work was part of a larger contract which included the repairing of part of Washington Boulevard near the Bridge. The court accepted the method proposed by B & O's expert, Dr. Bittenbinder, and allocated the traffic maintenance costs to the length of the Bridge as compared to the total length of the project (0.02 divided by 0.62 miles). Rather than the 49% of the traffic maintenance contract costs ($31,850) it requested, the City was awarded $2,096.77, or 3.2% of the total cost. We perceive no error in this award.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.