## CSX TRANSPORTATION, INC.

### v.

## MAYOR AND CITY COUNCIL OF BALTIMORE CITY, MARYLAND.

### Civ. No. JFM-90-690.

United States District Court,
D. Maryland.

Feb. 20, 1991.

H. Russell Smouse, Whiteford, Taylor & Preston, Baltimore, Md., for plaintiff.

Richard Jacobsen, Baltimore, Md., for defendant.

### MEMORANDUM

MOTZ, District Judge.

The question presented in this declaratory judgment action is whether a September 24, 1986 Agreement between the Baltimore and Ohio Railroad Company ("B & O"), the predecessor of CSX Transportation, Inc. ("CSXT"), and the City of Baltimore (the "City") is a valid and binding contract.[1]

---

1. On December 21, 1990, I entered a Memorandum and Order ruling in favor of CSXT. Thereafter, the City filed a motion to alter or amend the judgment. The City's motion has led me to modify my reasoning in some respects but not my ultimate conclusion. Since the issues presented are already somewhat complex, I have decided to avoid the unnecessary confusion which would be caused by rendering a new opinion addressing solely the matters raised by the City's motion to amend. Instead, I will withdraw my original Memorandum and substi-

The Agreement pertains to the reconstruction of two railroad bridges, known as the Hamburg Street bridge and the Ostend Street bridge, and it was made in anticipation of obtaining federal funding for the reconstruction projects. It provides, *inter alia*, for the City to assume any responsibilities which CSXT may have for reconstruction and maintenance of the bridges in exchange for the payment by CSXT to the City of fifteen percent of the projects' costs, up to $916,000.

The City seeks to repudiate the Agreement. Citing *Baltimore and Ohio Railroad Co. v. Kuchta*, 76 Md.App. 1, 543 A.2d 371, *cert. denied*, 313 Md. 688, 548 A.2d 128 (1988), the City contends that entering into the contract was an *ultra vires* act on its behalf. In response, CSXT argues that assuming *Kuchta,* as a matter of state law, would have the effect of voiding the Agreement, federal law applies to matters pertaining to railway crossing construction projects for which a state or municipality has chosen to seek federal funding, and that under federal law the "second comer" doctrine upon which *Kuchta* rests is preempted.[2] The parties have filed cross-motions for summary judgment.

## I.

In 1909 the City and the B & O entered into an agreement pertaining to the relocation of certain tracks in exchange for the B & O's commitment to build several bridges, including the Hamburg Street bridge and the Ostend Street bridge. The Mayor and City Council of Baltimore enacted an ordinance codifying the agreement. Under the terms of the ordinance, the B & O had the responsibility to maintain the bridges. The ordinance was silent on the question of which party had the responsibility to re-

place the bridges, if that were to prove necessary.

Over the course of time the bridges deteriorated. Beginning in 1981, a series of memoranda reflect the parties' increasing concern for the bridges' structural integrity and the need to replace or repair them. During the next several years engineering studies were conducted and the parties engaged in negotiations concerning the financing of the bridges' reconstruction or repair. These negotiations culminated in the execution of the September 24, 1986 Agreement now in issue. As indicated above, under the Agreement the City assumed responsibility for reconstruction and maintenance of the bridges. B & O gave various consideration in return, including the payment (up to $916,000) of fifteen percent of the project costs and a "close clearance" under the bridges. The close clearance was an item of significance because it results in an abnormally narrow clearance above and to the side of the railroad track, considerably increasing CSXT's burden of safety vigilance. The Agreement further contained an escape clause giving the City the right of rescission in the event that federal funding for the reconstruction of the bridges did not become available within thirty-six months of the date of the Agreement.

The old Hamburg Street bridge has now been demolished and replaced. A sum of $4,564,876 has been contributed by the Federal Highway Administration ("FHWA") to the cost of the project. Demolition and reconstruction of the Ostend Street bridge has not yet begun, but the City concedes that federal funding is available for the project if the City should choose to apply

tute this one in its stead, incorporating the changes prompted by the City's motion to amend.

**2.** CSXT also argues that if *Kuchta* does apply, the City's repudiation of the Agreement would constitute a violation of the contract clause of the United States Constitution. U.S. Const. art. I, § 10, cl. 1. Because I conclude that *Kuchta* is preempted to the extent that it would have the effect of voiding the Agreement, I need not reach this question. However, I note that

CSXT's argument has substantial force, at least as to the Hamburg Street project. There, the new bridge has already been constructed, and CSXT has provided the City with an abnormally "close clearance" under it. Accordingly, the parties cannot be placed in the *status quo ante,* and CSXT would suffer irremediable harm by virtue of the City's repudiation of the Agreement. *Cf. United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).

for it.[3]

While the 1986 Agreement was being negotiated, the City and the B & O were in the Circuit Court for Baltimore City litigating a dispute over whether the B & O was responsible for the cost of reconstruction of another bridge over B & O tracks in an area known as Morrell Park. This litigation ultimately resulted in the Maryland Court of Special Appeals' decision in *Baltimore and Ohio Railroad Company v. Kuchta, supra.* The Court of Special Appeals held that the B & O was liable for paying the entire cost of reconstruction of the Morrell Park bridge and that a 1907 agreement, which B & O contended required the City to pay one-half of the reconstruction cost, was void. The decision rested upon the "second comer" doctrine, well established in the common law, which provides, in effect, that a party who builds a new road or way intersecting an existing right of way is responsible for constructing and maintaining a safe crossing at the intersection. The court reasoned that, because the second comer doctrine made the B & O liable for one hundred percent of the cost of reconstruction of the Morrell Park bridge, the City unlawfully surrendered its police power and committed an *ultra vires* act when it entered into the 1907 agreement.

After *Kuchta* was decided by the Court of Special Appeals, the City declared its intent to repudiate the Agreement here in question. CSXT then instituted this action.

## II.

In making its summary judgment motion, CSXT proceeds from the assumption that the City is correct in its contention that under *Kuchta* the Agreement is void as a matter of state law. Such an assumption is appropriate; if application of *Kuchta* to the particular facts of this case the sole question presented, the Maryland state courts might well constitute the proper forum for the conduct of this litigation.[4] This Court, however, is the proper forum to decide the federal preemption question.

23 U.S.C. § 130 was originally enacted as a part of the Federal–Aid Highway Act of 1944, P.L. 78–521. A purpose of that Act was to relieve railroads of the burden of rehabilitating or replacing railway-highway crossings, including bridges. Section 5(a) of the Act (now codified as § 130(a)) provided in part:

> That the entire construction cost of projects for the elimination of hazards of railway-highway crossings, including the separation or protection of grades at crossings, the reconstruction of existing railroad grade crossing structures, and the relocation of highways to eliminate grade crossings, may be paid from Federal funds....

Section 5(b) of the Act provided that railroads might be required to reimburse the federal government for the construction or reconstruction work. However, reimbursement could be ordered only to the extent of the "net benefit" to the railroad, and any such net benefit could not exceed ten per-

---

**3.** In my earlier opinion, I stated that the City further concedes that if the Agreement is not void, it is required under the Agreement to seek and obtain available federal funding. In its motion to amend the City denies that it made that concession. The transcript of the oral argument at the summary judgment hearing will speak for itself in this regard. In any event, the question of the City's concession aside, the entire Agreement is premised upon the City seeking to obtain federal funding. Although the Agreement contemplates the possibility that the funding might not be obtained for one or both of the projects and, in that event, provides for a refund of all or one-half of the $916,000 to CSXT, the duty of good faith implied in every contract certainly requires the City to make a reasonable attempt to obtain the funding.

**4.** It perhaps is worthy of note that this case may be distinguishable from *Kuchta* on the ground that CSXT may have ancillary rights against the Maryland Stadium Authority, the Maryland Mass Transit Authority, and the City itself as a result of the fact that, over the years, CSXT has directly or indirectly conveyed to these entities much of the land upon which its tracks formerly lay. Consequently, whereas the Hamburg Street and Ostend Street bridges previously ran over a B & O rail yard consisting of multiple parallel tracks, CSXT's present right of way has been reduced to a single track within a fifty-foot right of way. The City does not deny that CSXT may have ancillary claims against parties who now hold rights of way under the bridges, and the validity and extent of any such claims need not now be addressed.

cent of the total cost of the project. 23 U.S.C. § 130(b).

In 1958 the Act was revised and recodified. *See* Pub.L. 85–767, Aug. 27, 1958. A portion of the Senate Report leading to this reenactment demonstrates that Congress was fully aware of the general purpose of the Act to relieve railroads of the burden of paying for the improvement of crossings. The Report referred to new language which was intended to clarify that the ten percent "net benefit to the railroad" restriction is intended to apply to projects which are financed on a fifty-fifty basis by the state and federal governments, as well as to those which are one hundred percent federally funded. Likewise, language was added to "limit the contribution for a railway-highway crossing elimination to 10 percent from all railroads involved in a particular project, and not expect 10 percent contribution from each railroad." S.R. No. 1928, July 23, 1958, 2 [1958] U.S.Code, Cong. & Admin.News 3942, 3945.

To permit states to recover from a railroad the cost of constructing or reconstructing a bridge under the second comer doctrine would be self-evidently inconsistent with Congress's intent to have at least ninety percent of that cost borne by governmental authorities on federally funded projects. Accordingly, the FHWA has issued regulations which provide that "State laws requiring railroads to share in the cost of work for the elimination of hazards at railroad-highway crossings shall not apply to Federal-aid projects." 23 C.F.R. § 646.210(a) (1990). This language could not be more clear. It means, very simply, that once a state or local government agrees to the federal funding of a railroad crossing construction or reconstruction project, it cannot seek to impose the cost of that project upon the railroad. To the extent that state law would void such an agreement (or any subsidiary implementing agreement between the state or local government and the railroad) as being *ultra vires*, that law is necessarily preempted.

23 C.F.R. § 646.210(b)(2) confirms that § 646.210(a) means what it says. It provides that "[p]rojects for the reconstruction of existing grade separations are deemed to generally be of no ascertainable net benefit to the railroad and there shall be no required railroad share of the costs, unless the railroad has a specific contractual obligation with the State or its political subdivision to share in the costs." Although the purpose of this section is to direct the FHWA itself to refrain from seeking reimbursement from a railroad, its unspoken premise is that the second comer doctrine does not apply where federal funding is provided. If the doctrine did apply, the FHWA would be paying a cost for which the railroad was one hundred percent liable; it would be nonsensical to conclude that the assumption of such a liability does not constitute a "net benefit" to the railroad. Moreover, it is obvious that to permit a state or local government to first receive federal funding for a project, and then to obtain like reimbursement from a railroad for the cost of the same project would be to provide a windfall to the state or local government. It hardly need be stated that this is not the purpose of the federal legislation.[5]

### III.

The City advances four reasons why *Kuchta* is not preempted by 23 U.S.C. § 130 and the governing federal regulations.

First, the City contends that 23 C.F.R. § 1.9(a) dictates that a state common law rule enforcing the second comer doctrine must be given full force and effect. That section merely provides that "Federal-aid funds shall not participate in any cost which is not incurred in conformity with applicable Federal and State law, the regulations in this title, and policies and procedures prescribed by the Administrator." Clearly, this general admonition of lawfulness is not intended to overrule the specific

---

5. 23 C.F.R. § 646.210(d) is also of some pertinence. It provides, in part, that "other parties may voluntarily assume the railroad's share."

That would not be true if the second comer doctrine prohibited state and local governments from assuming the railroad's share.

provisions of 23 C.F.R. § 646.210. Moreover, the City's contention begs the question: the very issue presented is whether "State law" is "applicable" or whether it is preempted.

Second, the City argues that 23 C.F.R. § 646.210(a) does not apply to the present case because the federal funding for the Hamburg Street bridge has been made (and as to the Ostend Street bridge will be made) pursuant to 23 U.S.C. § 144 rather than 23 U.S.C. § 130. The factual predicate of this argument is incorrect. The City has received eighty-five percent federal funding for the Hamburg Street project and anticipates receiving eighty-five percent federal funding for the Ostend Street project. This alone demonstrates that the funding was made pursuant to § 130, not § 144, because, the federal share of § 130 funding (at the time that the Agreement was made) could be up to one hundred percent[6] whereas the federal share of § 144 funding is confined to only eighty percent. 23 U.S.C. §§ 130 and 144(f).[7] Furthermore, even if the funding were made pursuant to § 144 rather than § 130, 23 C.F.R. § 646.210(a) would still apply. Pursuant to 23 C.F.R. § 646.200(b) the regulations in the § 646.200 series apply to all "Federal-aid projects involving railroad facilities, including projects for the elimination of hazards of railroad-highway crossings...." Likewise, 23 C.F.R. § 646.202 cites as authority for the issuance of the § 646.200 series not only 23 U.S.C. § 130 but also 23 U.S.C. § 315, which gives the Secretary of Transportation power "to pre-

scribe and promulgate all needful rules and regulations for the carrying out of the provisions of this title." "This title," as used in § 315, includes § 144.

Third, the City relies upon a condition stated in the FHWA's approval of the federal funding for the Hamburg Street project which provides as follows:

Since the financial responsibility for the bridge replacement is currently being litigated, this authorization is given with the understanding that if the CSX Railroad is ultimately held financially responsible for part or all of the work included in this project an appropriate credit will be made to the federal-aid portion of this project.

The City contends that this condition reflects that "neither the Federal Government nor the State intended to have the federal regulations which limit or excuse railroads from participating in projects of this sort to apply." This contention is frivolous. The condition to the FHWA's approval was not imposed until *after* CSXT entered into the September 24, 1986 Agreement. In any event, its obvious purpose is simply to prevent the City from being reimbursed both by the federal government and by CSXT in the event that the City prevails in this litigation. Moreover, even if the provision were intended to have any greater effect, it is self-evident that a government contracting officer does not have the authority in approving the funding for a particular project to override the preemptive effect of federal law.

---

6. Section 130(f), limiting the federal share to ninety percent, was not enacted until April 2, 1987. That section was added by § 121 of the Surface Transportation and Uniform Relocation Assistance Act of 1987, P.L. 100–17, 1 [1987] U.S.Code, Cong. & Admin.News, 101 Stat. 160.

7. As a matter of statutory construction, it is likewise evident that § 130 is applicable here. Although § 144 was enacted subsequent to § 130, § 130 specifically applies to railway-highway crossings whereas § 144 applies generally to highway bridge replacement and rehabilitation. It is well-established that "[w]here one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any con-

flict, the latter will prevail, regardless of whether it was passed prior to the general statute, unless it appears that the legislature intended to make the general act controlling." 2A Sutherland, *Statutes and Statutory Construction,* § 51.05 at 499 (4th ed. 1984 rev.). There is no indication in the legislative history of § 144 that it was intended to restrict the funding available for the construction and reconstruction of railway-highway crossings under § 130. To the contrary, it appears that bridges over railroads were mentioned in § 144(a) only to make sure that funds would "be apportioned to each State yearly to replace, in whole or in part, deficient highway bridges on all public roads, *regardless of what they cross.*" Conf.R. No. 95–1797, repr. in 1978 U.S.Code, Cong. & Admin.News 6575, 6706. (Emphasis added).

Fourth, the City apparently argues that federal funding is unavailable for the projects because the two bridges are owned by CSXT and that the projects are therefore not "public" ones. If the Agreement itself is taken into consideration, the factual premise of this argument is plainly incorrect: under the terms of the Agreement title to the bridges was conveyed to the City.[8] Further, regardless of who held legal title to them, the bridges were "public highways" under Maryland law. *See State v. Potomac Edison Co.*, 166 Md. 138, 144, 170 A. 568, 570 (1934); Md.Transp.Code Ann., § 8–101(h); Md.Ann.Code art. 23, § 237. In any event, nothing in the federal statutes and regulations draws any distinction based upon ownership.

For these reasons, I find that to the extent that the decision of the Maryland Court of Special Appeals in *Baltimore and Ohio Railroad Co. v. Kuchta* would have the effect of voiding the September 24, 1986 Agreement, it is preempted by federal law, and that the Agreement is therefore a binding and lawful contract. I am entering herewith a declaration to that effect.

### ORDER

For the reasons stated in the memorandum entered herein, it is this 20th day of February 1991

ORDERED

1. The Memorandum and Order which I entered on December 21, 1990 are hereby withdrawn;

2. The motion for summary judgment filed by the Mayor and City Council of Baltimore City, Maryland is denied;

3. The motion for summary judgment filed by CSX Transportation, Inc. is granted; and

4. It is declared that the September 24, 1986 Agreement between the City of Baltimore and the Baltimore and Ohio Railroad Company (the predecessor of CSX Trans-

portation, Inc.) is a valid and binding contract.

---

**8.** This conveyance may have been unnecessary. It may be that title to the bridges was vested in the City as soon as they became part of the City's highway system. *See* 74 C.J.S. *Railroad* § 141 at 585–86.